## HEYWARD v. BRADLEY et al.

### (Circuit Court of Appeals, Fourth Circuit. May 4, 1910.)

### No. 895.

**1. SPECIFIC PERFORMANCE (§ 28\*)—CONTRACTS ENFORCEABLE—CERTAINTY.**

An option provided that on plaintiff's election after examining defendant's land defendant would convey all phosphate rock and phosphate deposit contained on or in all of the Middleton lands on Ashley river, described in a specified plat, containing about 5,507 acres, for the sum of $20,000, and also convey a right of way over defendant's other lands to the Ashley river together with a site on the river for a washer. *Held,* that such option having ripened into a contract by the payment of the money, though the right of way and washer site were not located, the contract was not so vague or uncertain as to be incapable of specific performance.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 61, 62; Dec. Dig. § 28.*]

**2. SPECIFIC PERFORMANCE (§ 52\*)—CONTRACTS ENFORCEABLE—MISTAKE.**

Defendant executed a written contract to convey all phosphate rock and phosphate deposit contained on or in all that portion of specified land lying between certain boundaries containing about 5,507 acres for $20,000. Several months elapsed between the execution of the option and the payment of the price during which plaintiffs' employés were engaged in openly prospecting the land, and new deposits were discovered of which defendant must have had knowledge. *Held,* that it was no defense to a suit for specific performance that it was defendant's intention only to sell that portion of the phosphate rock that lay within a tract of about 100 acres, already partially mined.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 155, 159; Dec. Dig. § 52.*]

**3. SPECIFIC PERFORMANCE (§ 49\*)—UNCONSCIONABLE CONTRACT—INADEQUACY OF CONSIDERATION.**

Defendant, aided by the advice and co-operation of her husband, who was a lawyer, contracted to sell to plaintiffs for $20,000 all the phosphate rock underlying certain land, the right to mine, however, being subject to certain timber rights, which might prevent plaintiffs from mining a large part of the land until 1923. Explorations disclosed that on the land claimed there was about 280,000 tons of phosphate rock on which a reasonable royalty would be 25 cents per ton, or $70,000. *Held,* that the contract having been voluntarily made after full opportunity for deliberation, by educated persons of more than ordinary intelligence, was not so unconscionable, nor based on such a grossly inadequate consideration, as to warrant the imputation of fraud, and justify denial of specific performance, under the rule that only such inadequacy of price as shocks the conscience and amounts to conclusive and decisive evidence of fraud will justify the denial of such relief.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 151; Dec. Dig. § 49.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. SPECIFIC PERFORMANCE (§. 16*)—GROUNDS FOR DENIAL OF RELIEF—HARD-
SHIP.

The court in its discretion would not be authorized to deny specific performance because performance of the contract, independent of fraud, would result in hardship to defendant, there being no circumstance other than alleged inadequacy of consideration constituting such hardship.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 35; Dec. Dig. § 16.*]

Appeal from the Circuit Court of the United States for the District of South Carolina, at Charleston.

In Equity. Suit by Peter B. Bradley and Robert S. Bradley against Elizabeth M. Heyward. Decree for complainants (164 Fed. 107), and defendant appeals. Affirmed.

Julius H. Heyward and C. P. Sanders (Sanders & De Pass, on the brief), for appellant.

George F. Von Kolnitz, for appellees.

Before PRITCHARD, Circuit Judge, and WADDILL and KELLER, District Judges.

PRITCHARD, Circuit Judge. The careful investigation which we have given this case, required by its importance, and necessary in order to properly dispose of the questions presented by the assignments of error, impels us to the conclusion that the decree complained of is without error. Finding ourselves in full accord with the conclusions of the court below, we have approved the same, and adopt the views of that court as our opinion. We quote with approval as follows:

"This is a bill for specific performance of a contract for the sale of phosphate rock and phosphate deposit on the Middleton lands on Ashley river. The plaintiffs, citizens of Massachusetts, are the owners of a large body of phosphate land in this state lying near the Middleton place. Being desirous of extending their holdings, they employed George F. Von Kolnitz, Esq., a lawyer of Charleston, in the spring of 1905, to obtain options on other lands, and it appears from the testimony that he succeeded in obtaining about 30 options. With that purpose he made a visit to Greenville in April, and had an interview with Julius H. Heyward, Esq., the husband of the defendant, and commenced negotiations with him. Mr. Heyward informed him that nothing could be done without consultation with his wife, then on the Middleton place, and Mr. Von Kolnitz offering to pay his expenses, Mr. Heyward came down, and, after conference with the defendant, agreed with the plaintiffs' attorney upon the terms, and prepared the agreement which gives rise to this controversy, Mr. Von Kolnitz adding the stipulation as to right of way, and the agreement was executed April 20, 1905. The agreement provides:

"'(1) That the said Elizabeth M. Heyward for and in consideration of the sum of $5 to her in hand paid hereby grants and conveys to the said George F. Von Kolnitz, Jr., attorney, for the period of four months from this date, the right and option to purchase all phosphate rock and phosphate deposit contained on or in all that portion of the Middleton lands on Ashley river, etc., containing about 5,507 acres, more or less.

"'(2) That the said George F. Von Kolnitz, Jr., attorney, hereby agrees to pay for said phosphate rock and phosphate deposits (if after examination of said land he shall elect to purchase the same) the sum of $20,000, payable in cash on the 20th day of August, A. D. 1905, on which date this option shall expire.

"'(3) That the said George F. Von Kolnitz, Jr., attorney, his agents and employés are hereby granted all necessary rights of access to and entry upon said

land during the above limited period for the purpose of examining the same by soundings, excavations, etc., and all necessary conveyances are in due course to be executed and delivered for the purpose of completing said sale and transfer, which conveyances shall also include the right to a right of way to the Ashley river over the other lands of said Elizabeth M. Heyward, and a site upon said river for a washer, provided, however, that neither said right of way nor site shall in any way interfere with the rights granted heretofore to the United Timber Company, as shown by a lease now on record in the office of the registry of mesne conveyance, Dorchester county.'

"On August, 1905, Mrs. Heyward addressed a letter to George F. Von Kolnitz, attorney, saying: 'The limit of the option heretofore granted you by me for the purchase of the phosphates on the Middleton lands and rights set forth therein is hereby extended to September 1, 1905.' On the 30th of August, Mr. Von Kolnitz paid to the defendant the sum of $20,000, and shortly thereafter prepared a deed conveying to plaintiff all the phosphate rock and phosphatic deposits contained in the land described, and providing a right to construct and operate tramways, or railways, over and upon the lands for the mining or removal of the rock, and the right to occupy a site on the Ashley river for a washer, which Mr. Heyward, who throughout all the negotiation had represented the defendant, with her written authority, objected to, and, after some fruitless negotiations and correspondence, the defendant referred Mr. Von Kolnitz to her attorney, H. A. M. Smith, Esq., who, after some negotiations, prepared an instrument in writing to carry into effect the agreement of April 20, 1905, which was acceptable to Mr. Von Kolnitz, but which Mrs. Heyward refused to execute. Being unable to reach any agreement, this bill has been filed.

"In the answer and in the argument numerous grounds are set up why the agreement should not be specifically enforced. The first is as set forth in the answer, that the terms are 'too vague and uncertain to be capable of reasonable construction and enforcement, inasmuch as no place is fixed for the site of the washer therein referred to, and no limits or boundaries are fixed for the right of way mentioned in said option, nor is the compensation fixed for the use of either.'

"It appears from the testimony that all the negotiations between the parties were conducted between Mr. Von Kolnitz on the one side, and Mr. Heyward on the other. Both of them are lawyers of mature age and considerable experience. The agreement was prepared by Mr. Heyward. It involves a considerable sum of money, and was prepared after full deliberation, and it is fair to assume that when he prepared a paper of this character he intended, if the other party performed its obligation, to give an enforceable contract, and not a mere option on a lawsuit, wherein the measure of damage for breach of contract would be so uncertain as to have no calculable value. I cannot agree to the contention that the terms •of this contract are 'too vague and uncertain to be capable of reasonable construction and enforcement.' The main features of the agreement are perfectly clear, and that is, that the plaintiff, if after examination of the land he shall elect to do so, shall have the right to purchase all phosphate rock and phosphate deposit contained on or in all of the Middleton lands on Ashley river described in the plat of Simons and Mayrant, containing about 5,507 acres. It is further stipulated that all necessary conveyances are in due course to be executed and delivered for the purpose of completing said sale and transfer. It is true that the location and dimensions of the right of way are not specifically designated, but it seems to me that the maxim 'id certum est quod certum reddi potest' applies. The testimony is that a right of way for the removal by rail or tram of phosphate rock when mined, and a washer for the purpose of cleaning it, are necessary for the reasonable use of the thing agreed to be sold, and the agreement stipulates specifically for such right of way and a site for a washer. In the nature of the case the precise location of this right of way and washer could not be determined in advance, because it was uncertain where the phosphate rock would be found. In the timber lease referred to there was provision for a right of way not exceeding 66 feet in width, and the location was fixed because the site of the timber was known. In this case it seems to me that there will be little practical difficulty in defining such lo-

cation of right of way and site for washer as would be consistent with the proper use and enjoyment of the main thing granted; that is, the removal of the phosphate rock in the land, and of course with due regard to the rights of Mrs. Heyward.

"The next ground stated as reason for nonperformance is that of mistake. Mr. Heyward testifies that when Mr. Von Kolnitz approached him on the subject he informed him that he knew that there was a body of phosphate deposit upon a certain tract of the Middleton lands, but it was a low-grade rock, and had been worked over by several parties, and that in drawing the agreement he had in mind this tract only. The testimony is that during the lifetime of the father of the defendant several parties successively had mined phosphate on this land, one after the other abandoning operations, and that is was supposed that the phosphate had been exhausted, and each succeeding party finding new deposits, but for a number of years there had been no mining upon the lands. Mr. Heyward's home is in Greenville, but his wife, the defendant, usually spends the winter and spring at the Middleton place, and Mr. Heyward is frequently there. There is no room to doubt that neither Mr. Heyward nor Mr. Von Kolnitz, when the agreement of April 20, 1905, was entered into, had any knowledge of the extent of the phosphate deposit upon these lands, nor is there any ground to believe from the testimony that the plaintiffs had any actual knowledge, although from their experience and the nature of their business they would presumably be more capable of forming a correct opinion on this subject than Mr. Heyward would be. The nature of this phosphatic deposit in the low country of South Carolina is peculiar, and has given rise to much curious speculation. It is found sometimes in pockets, and sometimes in strata, of greater or less thickness, lying at greater or less depth, in certain territory, but does not appear to be a continuous strata.

"A plat was exhibited at the hearing, prepared by Simons and Mayrant from data furnished by M. E. Hertz, under whose directions the investigation was made, from which it appears that upon the whole tract of over 5,500 acres rock was found at 982 stations on about 560 acres; 71 pits were opened, and the rock was found at an average depth of a little over 8 feet, the average thickness of the strata being about 8½ inches. The claim now made, that it was the intention of the defendant to sell only that portion of the phosphate rock lying within a tract of about 100 acres, which had already been partially mined, is utterly inconsistent with the agreement whereby is given in plain words the right to purchase 'all phosphate rock and phosphate deposit contained on or in all that portion of the Middleton lands on Ashley river,' lying between certain boundaries, containing about 5,507 acres, and whatever may have been the defendant's knowledge or lack of knowledge of the extent of the phosphatic deposit in April, certainly by the end of August, when she accepted the payment of $20,000, she must have known that other deposits had been discovered, for a large number of men employed by plaintiffs had been engaged for months, with her permission, in making soundings over the whole tract. It was the kind of work that could not be done secretly. Those who had eyes to see could see what was going on, and it appears from the testimony and from the correspondence of Mr. Heyward that he had other offers during the summer of 1905, for he was somewhat urgent that the matter be closed, expressing the belief that he could make make more advantageous term with other parties if plaintiffs declined to take, and in one of his letters he says: 'I am confident there is a quantity of rock on the land.' Neither at the time the money was paid nor at any other time prior to the commencement of this suit, so far as appears from the record, was there any contention that there had been any mistake. The Master of the Rolls in Swaisland v. Dearsley, 29 Beavan, 433, says: 'The principle upon which this court proceeds in cases of mistake is this: If it appears upon the evidence that there was in the description of the property a matter about which a person might bona fide make a mistake, and he swears positively that he did make such mistake, and his evidence is not disproved, this court cannot enforce the specific performance against him. If there appear on the particulars no ground for the mistake, if no man with his senses about him could have misapprehended the character of the parcels, then I do not think it is sufficient for the purchaser to swear that he made a mistake or that he

did not understand what he was about.' This case was cited in Tamplin v. James, 15 L. R. Chancery Division [218], by Baggalay, L. J., who says: 'I think that the law is correctly stated by Lord Romilly in Swaisland v. Dears-ley [29 Beav. 430, 433],' and after referring to the facts in that case, he says: 'But where there has been no misrepresentation, and where there is no ambiguity in the terms of the contract, the defendant cannot be allowed to evade the performance of it by the simple statement that he has made a mistake. Were such to be the law the performance of contracts could rarely be enforced upon an unwilling party who is also unscrupulous. * * * I think that he is not entitled to say to any effectual purpose that he was under a mistake when he did not think it worth while to read the particulars and look at the plans. If that were to be allowed a person might always escape from completing the contract by swearing that he was mistaken as to what he bought, and great temptations to perjury would be offered. Here the description of the property is accurate and free from ambiguity.' Fry on Specific Performance says (section 765): 'It seems on general principles clear that one party to a contract can never defend himself against it by setting up a misunderstanding on his part as to the real meaning and effect of the contract or any of the terms in which it is expressed.'

"I think there is no merit in this contention; and this brings me to the consideration of the other grounds set up as a defense, and as reasons for a rescission of the contract which the answer prays. They are that the contract is an unconscionable one; that the consideration paid is grossly inadequate, and that the enforcement of it by the court would result in injustice and hardship to the defendant.

"The parties to the contract have already been named, both parties being represented by competent lawyers. It is not therefore a case of the wolf and the lamb. The fairness of it must be judged of as of the time at which it was entered into. The defendant was the owner of a large body of land upon which it was known that there was a phosphate deposit, but the extent of that deposit was not known. There is nothing in the testimony which shows that the defendant was at that time under any stress of necessity which would impel her to sacrifice her property, and there is no testimony tending to show misrepresentation or concealment on the part of the plaintiffs. The extent of the phosphate deposits could only be ascertained after thorough examination, which required time, skill, and the expenditure of a considerable amount of money. The plaintiffs were willing to make this expenditure if, after their examination, they could purchase upon terms which would be profitable to them. The defendant, after time for full deliberation, fixed those terms. Up to this point it seems clear that the contract was made fairly, without fraud or over-reaching or taking any undue advantage. It was not made in haste, but after full opportunity for deliberation, by educated men, of more than ordinary intelligence, having the use of their eyes, their minds on the alert, and their interest awakened, and means of knowledge being open to both. It was known to both parties that there was rock on the land. The plaintiffs were willing to expend the time and money necessary to develop the extent of the deposit, and the defendant was willing to allow them to do so, limiting the time for such examination, and agreeing to sell all the rock upon the land for a fixed sum; all the expense of this exploitation was to be borne by the plaintiffs. This expense, according to the testimony, was something over $2,500, and would have been a total loss to the plaintiffs if rock in paying quantities had not been found. There is nothing unreasonable or unconscionable in such a contract. In the very nature of things all mining operations are problematical and doubtful. No science can afford a sure guarantee against losses, disappointment, and reverses, and it comes to this: Shall the plaintiffs be deprived of the benefits of a contract, fair and unobjectionable at the time it was made, because it has turned out that as the result of their enterprise and expenditure a much larger quantity of rock has been discovered on the land than the defendant believed to be there at the time the contract was made?

"Haywood v. Cope, 25 Beavan, 140, was a case for specific performance of a mining contract, where the mines turned out to be worthless. It appears in that case that the plaintiff had, 20 years before, worked the coal under his

estate, but abandoned it as unprofitable. There were two pits on the ground, and, before entering into the agreement with the plaintiff, the defendant applied for leave to have one of them cleared and to examine the coal in the shaft. He went down and examined the coal, and afterwards the agreement was entered into, and the defendant went into possession. It was soon discovered that the coal was 'absolutely not worth getting.' Upon a bill for specific performance the defendant resisted, on the ground of the uncertainty of the contract, misrepresentation and concealment of the plaintiff, and the hardship of being obliged to pay £100 a year during the remainder of the lease, without receiving any benefit whatever from the mines. Although he had examined the mines before purchasing, he said that he had no knowledge of mines, and that he was wholly ignorant of these matters. The Master of the Rolls says: 'The real fact is that the speculation has turned out to be extremely bad, and this is shown by the evidence. The seams dwindled down from 3 feet to 20 inches, but if instead of diminishing it had increased to that extent, the court would probably have heard nothing about it. Then it is said that this is an extremely hard case; that in point of fact the plaintiff is insisting upon the defendant paying him £1,400 for a thing that has turned out to be literally worth nothing, and that according to the discretion that the court exercises in such cases it cannot compel specific performance of the contract. Upon this subject, which is one upon which I have before made several observations, I will refer again to a passage which I have always considered binding upon me, for it is most important that the profession and those who have to advise in reference to this subject, should understand the rule which is adopted in this and the other courts, which is that the discretion of the court must be exercised according to fixed and settled rules; you cannot exercise a discretion by merely considering what as between the parties would be fair to be done; what one person may consider fair another person may consider very unfair; you must have some settled rule and principle upon which to determine how that discretion is to be exercised.' Lord Eldon observes in the case of White v. Daman [7 Ves. 35]: 'I agree with Lord Rosslyn that giving specific performance is matter of discretion, but that it is not an arbitrary, capricious discretion; it must be regulated upon grounds that will make it judicial. I also refer, as I have upon former occasions, to a passage from the celebrated argument of the Master of the Rolls in Burgess v. Wheate [1 Eden, 214], where at the conclusion he cites a well known passage from Sir Joseph Jekyll upon the subject of discretion of the court, and gives his own opinion. He says: And though proceedings in equity are said to be secundum discretionem boni viri, yet when it is asked vir bonus est quis, the answer is qui consulta patrum quit legis jura que servat, and, as it is said in Rooke's Case [5 Coke, 99b], discretion is a science not to act arbitrarily, according to men's wills and affections, so the discretion which is to be exercised here is to be governed by the rules of law and equity, which are not opposed, but each in its terms to be subservient to the other. This discretion in some cases follows the law implicitly; in others assists it and advances the remedy; in others, again, it relieves against the abuse or allays the rigor of it, but in no case does it contradict or overturn the grounds or principles thereof, as has been sometimes ignorantly imputed to this court. That is a discretionary power which neither this nor any other court, not even the highest, acting in a judicial capacity, is by the Constitution intrusted with. This description is full and judicious, and it ought to be imprinted upon the mind of every judge. If, therefore, in a case of this description I were to say that according to my discretion I ought to leave these persons to their action at law, upon what principle or ground could I do it, except that in a matter of speculation it has turned out very favorably to one party and very unfavorably to the other? It is obvious that in a case of a sale at auction, if the property is sold for an extremely inadequate value, it is impossible for the person to repudiate the contract. The mere principle of what might have been fair or what might have been the right thing to do between the parties had all the elements of value been known which have since transpired cannot be ground for exercising or regulating the discretion of the court if all the facts which were then in existence were known to both parties. I can understand that the court will exercise the discretion, and will not enforce

the specific performance of a contract where, to a degree, the performance of the contract would be to compel a person who has entered inadvertently into it to commit a breach of duty, such as where trustees have entered into a contract the performance of which would be a breach of trust. Those are cases where by fixed and settled rule the court is enabled to exercise its discretion, but the mere inadequacy or excess of value is not in my opinion a ground for exercising any such discretion as that which is suggested in this case. That this is a very hard case there is no doubt, and it may be extremely proper that the plaintiff make an abatement in respect of it, but that is a totally different matter, one which is in the forum of his own conscience, but not one which I can notice judicially. In my opinion this is a contract which was fairly entered into between the parties. There is nothing to invalidate it, and the usual decree must therefore be made for the specific performance of the contract, with costs to the present time.'

"Fry on Specific Performance, says (section 389): 'The fairness of a contract, like all its other qualities, must be judged of at the time it is entered into, or at least when the contract becomes absolute, and not by subsequent events, for the fact that events uncertain at the time of the contract and afterwards were in a manner contrary to the expectation of one or both of the parties is no reason for holding the contract to have been unfair. The period, says the Irish Lord Chancellor Manners, at which the court is to examine the agreement between the parties is the time when they contracted.' The contention of the defendant which finds most support in the text-writers and in the decided cases is that a court of equity will refuse to lend its aid to the enforcement of a contract where the price paid is grossly inadequate to the real value. There is no fixed standard by which to determine this question of inadequacy which devolves upon the equity court the duty of revising men's bargains, and substitutes the chancellor's opinion for that of the contracting parties as to the price which ought to be paid. Lord Chief Baron Eyre says in Griffith v. Spratley, 1 Cox Ch. Cas. 388: 'The value of a thing is what it will produce and admits of no precise standard. It must be in its nature fluctuating, and will depend upon ten thousand different circumstances. One man in the disposal of his property may sell it for less than another would; he may sell it under a pressure of circumstances which may induce him to sell it at a particular time. Now, if courts of equity are to unravel all these transactions they would throw everything into confusion and set afloat all the contracts of mankind.' Lord Eldon says, in Coles v. Trecothick, 9 Vesey, 246: 'But, further, unless the inadequacy of price is such as shocks the conscience, and amounts in itself to conclusive and decisive evidence of fraud in the transaction, it is not itself a sufficient ground for refusing a specific performance.' Fry on Specific Performance says (section 44): 'There is an observation often made with regard to the jurisdiction in specific performance which remains to be noticed; it is said to be in the discretion of the court. The meaning of this proposition is not that the court may arbitrarily or capriciously perform one contract and refuse to perform another, but that the court has regard to the conduct of the plaintiff and to circumstances outside of the contract itself, and that the mere fact of the existence of a valid contract is not conclusive in the plaintiff's favor.' And in section 46: 'But of the circumstances calling for the exercise of this discretion the court judges by settled and fixed rules, hence the discretion is said to be not arbitrary or capricious, but judicial; hence, also, if the contract has been entered into by a competent party, and is unobjectionable in its nature and circumstances, specific performance is as much a matter of course and therefore of right as are damages. The mere hardship of the results may not affect the discretion of the court.'

"Before considering the testimony on the subject of inadequacy I will proceed to examine those cases cited and relied on by the defendant as establishing the principle upon which it is claimed that she is entitled to be relieved of the performance of this contract. In considering these cases it is well to bear in mind what was said by the great Chief Justice in Cohens v. Virginia [6 Wheat. 264, 5 L. Ed. 257]: 'It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used.' The first case cited, and one

which seems to be most relied on is Seymour v. Delancey, 6 Johnson's Ch. [N. Y.] 222. In that case Ellison, the ancestor of the defendant, was to convey two farms containing 763 acres of land, in exchange for one equal undivided one-third part of two lots of land in the village of Newberg. The chancellor, after reviewing the testimony, fixed the one-third of the Newberg lots at $6,000, and the farms at $12,000. He also found that Ellison 'was in the last year or two of his life rendered for a considerable part of his time unfit for business by habitual intoxication; his mind must have felt the pernicious effects of that habit, and have lost its original strength when he made the bargain in question. The proof is abundantly sufficient to render the fact of his competency to contract with the requisite judgment doubtful.' The contract was made in January and he died in August, and the chancellor says: 'This fact adds greatly to the force of the considerations growing out of the inadequacy of the price, and is clearly sufficient within the view of all the cases to render it highly discreet and just to refuse the aid of the court to the specific performance of so hard and so extravagant a bargain, gained from an habitual drunkard in the last year of his life and just before his infirmities have begun to incapacitate him entirely for business. There is another circumstance,' said he, 'in the case which ought to be taken into consideration, when the plaintiff comes here seeking a specific performance; he was not in a condition to give a good title to the village lots, either when he contracted or when the deeds were to be executed or at the time of the death of Ellison.' The decree of the chancellor, refusing specific performance, was reversed on appeal by the Court of Errors, 3 Cow. [N. Y.] 445 [15 Am. Dec. 270]. But the doctrine that 'inadequacy of price may of itself and without fraud or other ingredient be sufficient to stay the application of the power of this court to enforce specific performance of a private contract to sell land,' has the sanction of the great name of Chancellor Kent.

"The next case cited is one from our own state (Clitherall v. Ogilvei, 1 Desaus. 250), where the court refused to decree specific performance of a contract for the sale of land, where the inadequacy was very great. In its opinion the court refers to 'the reluctance of the defendant (a young man but just of age, ignorant of the land and its value) to determine the matter hastily, his wishing to consult with a friend whom he thought well acquainted with the land, showed plainly that he was not desirous of selling immediately and that he was not sufficiently competent to determine on the value. All these circumstances show that, though no fraud or imposition on complainant's part, yet there was such an eagerness, such an anxiety in him to conclude the bargain, such an astuteness of conduct as do not give it all the marks of fairness, justice, and equality. * * * That the consideration is enormously inadequate here I need only refer to the testimony of Capt. Pinckney, from whence it appears that the land at the lowest valuation must be worth four times as much as was agreed to be given for it.' In a note to that case by Chancellor Desaussure, he says: 'The rule seems to be that mere inadequacy of price in a contract deliberately made between two persons conusant of their rights and competent to manage their own affairs should not be a ground purely of itself to vitiate the contract, but the decided cases express a qualification which in reality is a material violation of the rule itself, for it is added that the inadequacy of price shall not vitiate the contract unless it be so gross that every good man would at once exclaim against it, and as would furnish violent presumptive evidence of fraud, imposition, or oppression in the buyer, or manifest ignorance or deep necessity in the seller.'

"The next case is Butler v. Haskell, 4 Desaus. 651, where the defendants agreed to sell for $1,200 for each share their interest in the estate of an idiot, and the bill was to set aside these sales, the proof being that each share was worth from $13,000 to $14,000; that the Butlers were uneducated and ignorant men in necessitous circumstances, who had employed the defendant as agent to establish their claims to the property, he being a man of ability, astuteness, and experience. In its opinion the court says: 'It has been left, perhaps wisely, to the experience of the courts of justice, to apply the mere principles of equity to each case according to its particular circumstances, and thus gradually to form a practical system of pure justice, and the courts have never decided as a broad principle that mere inadequacy of price unconnected

with direct fraud or imposition or concealment, or advantage taken of extreme weakness or great necessity, should be a distinct and independent ground of vitiating contracts, but the courts have said that the inadequacy may be so gross as to furnish strong and even conclusive presumption of fraud, and in this way the grossness of the inadequacy may avoid the sale.'

"The next case is Gasque v. Small, 2 Strob. Eq. 72. In that case the court refused to enforce specific performance and in its opinion says: 'In this case the defendant was a young man who had arrived at the age of 21 years a few weeks before the agreement, and who from the want of sagacity, advice and experience was unable to cope with the other party in the contract. It is manifest that his examination of the land was utterly insufficient to enable him to ascertain its value, which from the glowing descriptions of the advantage that he might derive from the purchase was no doubt greatly exaggerated in his imagination, and although the case does not come within the class of contracts of young heirs who are entitled to expectations, yet it approximates the principle in practice. The weight of evidence establishes such inadequacy of value that the most liberal calculation cannot resist the conclusion that Kirton (who, although apparently only the agent of Gasque, is the real party in interest) bargained the land to the defendant for double its value, and probably for three or four times as much as it would bring if sold at public auction.'

"The Church of the Advent v. Farrow, 7 Rich. Eq. [378], was a case where one Henry agreed to give to the church a lot for the site of an Episcopal church and for a burying ground, to contain one acre. Henry went to the spot and pointed out the lot, but no deed was executed. After his death his daughter objected to the use of the lot as a burial ground, and refused to sign a deed in the form demanded. The vestry brought suit for specific performance. Chancellor Johnstone, who heard the case on Circuit, said: 'I do not think there is sufficient evidence, even if parol proof were admissible, to establish an agreement which this court will enforce.' Chancellor Wardlaw, speaking for the Court of Appeals, affirming the decision below, says: 'Besides, if the plaintiff had proved sufficiently an agreement, the suit is an application to the extraordinary jurisdiction of the court, where discretion is tolerated and absolute right cannot be claimed. With every disposition to limit discretion we should hardly be disposed to afford relief to plaintiff when the enforcement of defendant's contract (essentially voluntary) although supported by the consideration of co-subscription, will be attended with inequitable loss to defendants in impairing the value of adjoining lots.'

"These are all of the South Carolina cases cited by the defendant. The cases in the Supreme Court of the United States, are, first, King v. Hamilton, 4 Pet. 328 [page 329 (7 L. Ed. 869)]. In its opinion in that case the court says: 'The complainants, after the lapse of 20 years seek for the specific execution of a contract which has not been performed on their part, and the execution of which will be manifestly unjust and unequitable.' The facts in that case have no possible analogy to those in the case under consideration, and it would be unprofitable to cite them in detail.

"Nickerson v. Nickerson, 127 U. S. 668 [8 Sup. Ct. 1355, 32 L. Ed. 314], was as stated in the opinion of the court on page 677 [of 127 U. S., on page 1359 of 8 Sup. Ct. (32 L. Ed. 314)]: 'The case of a husband who prior to marriage induced in the mind of his intended wife expectations in reference to real property, which, after marriage, he failed to meet, but in respect of that property he did not enter—and perhaps intentionally refrained from entering—into any distinct and binding agreement. * * * She relied upon his honor and has been deceived, but those facts, however strongly they appeal to our sympathy, cannot justify the court in finding upon the meager evidence in this case that there was an agreement upon his part, in consideration of marriage, to settle upon her either the property in Portland, or the property purchased with the proceeds of the sale.'

"McCabe v. Matthews, 155 U. S. 550 [on page 555, 15 Sup. Ct. 190, on page 192, 39 L. Ed. 256], was a case where Mrs. Montgomery entered into a written contract with Matthews for the conveyance of a tract of land containing 1,635 acres. The contract recited the consideration of one dollar, and the further consideration of a tract of five acres to be planted out in orange trees,

etc. The opinion of the court, sufficiently discloses the nature of the case, where Justice Brewer says: 'So that we have presented the case of one who, investing one dollar in the proposed purchase of land and doing nothing to assist his vendor in furnishing the property or performing the work necessary to be furnished and performed by such vendor to acquire the title to the land, waits nine years after his contract has been entered into, nearly nine years after he has good reason to believe that such vendor repudiates all liability under the contract, nearly five years after notice has been given by such vendor of his acquisition of the title by filing the deeds in the public records, two years after he receives actual notice of that fact, and then without the tender of any money or other consideration, appeals to a court of equity to compel such vendor to deed to him an interest in land worth at the time of his contract only $150, and now $7,500. It seems to us to be a case of purely speculative contract on the part of the plaintiff, doing nothing himself, he waits many years to see what the outcome of the purchase by the defendant shall be; if such purchase proves a profitable investment he will demand his share, if unprofitable he will let it alone. Under those circumstances the long delay is such laches as forbids a court of equity to interfere.'

"Willard v. Tayloe, 8 Wall. [557, 19 L. Ed. 501], was a bill for the specific performance of a contract for the sale of certain real property in the city of Washington, made in 1854, in the form of a lease for 10 years, giving the right or option to purchase, which was in the nature of a continuing offer to sell. The contract was not completed by the acceptance of the defendant's proposition to buy, until April, 1864, after the passage of the act of Congress making notes of the United States a legal tender, and one of the chief questions in the case was whether or not the complainant should pay the stipulated amount in gold and silver coin, the legal tender notes at the time when tendered being worth only a little more than one-half of the stipulated price. The court decided that the substitution of notes for coin could not have been in the possible expectations of the parties at the time the contract was made, and ordered the conveyance of the premises upon the payment in gold and silver coin. In considering the question whether there should be an enforcement of the contract owing to the fact that the property had greatly increased in value, the court says: 'It is true that the property has greatly increased in value since April, 1854. Some increase was anticipated by the parties, for the covenant exacts in the case of the lessee's election to purchase, the payment of one-half more than its then estimated value. If the actual increase has exceeded the estimate then made that circumstance furnishes no ground for interference with the arrangements of the parties. The question in such cases always is: Was the contract at the time it was made a reasonable and fair one? If such were the fact the parties are considered as having taken upon themselves the risk of subsequent fluctuations in the value of the property, and such fluctuations are not allowed to prevent its specific enforcement.'

"I have now reviewed all the cases in South Carolina and in the Supreme Court of the United States cited by the learned counsel for the defendant, and it seems to me clear that mere inadequacy of price upon a contract deliberately made between two persons conusant of their rights and competent to manage their own affairs does not of itself furnish ground to vitiate the contract; but the counsel insists that gross inadequacy is equivalent to fraud, and cites Byers v. Surget, 19 How. 303 [15 L. Ed. 670], quoting as follows: 'To meet the objection made to the sale in this case founded on the inadequacy of the price at which the land was sold, it is insisted that inadequacy of consideration, singly, cannot amount to proof of fraud. This decision, however, is scarcely reconcilable with the qualification annexed to it by the courts, namely, unless such inadequacy be so gross as to shock the conscience, for this qualification implies necessarily the affirmation that if the inadequacy be of a nature so gross as to shock the conscience it will amount to proof of fraud.' The facts in that case are a good illustration of the class of cases calculated to shock the conscience. Byers was a member of the firm of W. B. Duncan & Co., which in the year 1835 bought various tracts of land in the state of Arkansas. In 1836, upon the dissolution of the firm, these lands were conveyed to Byers. In 1840, four years after the dissolution of the firm of William B. Duncan & Co., an action was instituted in the name of that

firm by William B. Duncan against one Noadiah Marsh for a breach of covenant, and in that suit, under the plea of his subsequent discharge in bankruptcy, the court gave judgment in favor of the defendant, with costs of suit. This suit against Marsh was commenced and prosecuted long after the dissolution of the partnership, and, it was claimed, without their authority, all of them residing beyond the limits of the state of Arkansas. Surget, who had been Marsh's attorney in the inferior court, assumed to himself the power to tax the costs adjudged to the defendant, prepared a description of the property which he chose to have seized in satisfaction of that process, and ordered the sheriff to levy upon the whole of what he had so described, and under an execution for $39.10 peremptorily ordered the sale of more than 14,000 acres of land, belonging to Byers estimated by witnesses to be worth from forty to seventy thousand dollars, and as the court says: 'And, finally, under a proceeding irregular in its origin, commenced by himself and by him controlled in its consummation, of becoming the purchaser of the property estimated as above, for the sum of $9.13½, and refused after the sale and purchase to accept in redemption of the lands so sacrificed a sum of money tendered to him much more than equal to all the costs or all the expenses incident to the judgment.'

"In reviewing the facts, the court says: 'They betray that malus dolus in which the design of the appellant was conceived, which appears to have presided over and regulated the progress of the design from its birth to its consummation, to which design the appellant has tenaciously clung, in the seeming expectation that it was beyond the corrective powers of law or justice.'

"The rule as stated by Fry, § 442, is as follows: 'With regard to it as a ground for the setting aside of transactions, the doctrine of the court is that inadequacy of consideration, if only amounting to hardship, even great hardship, is no ground for relieving a man of a contract which he has wittingly and willingly entered into, but that it may be so enormously great as to be a conclusive evidence of fraud, and that it is then a ground for setting aside a transaction affected by it.' Section 443: 'Regarded as a ground of defense to a specific performance, the judgment of the older case was that inadequacy of consideration was a sufficient ground; it being regarded, even where not amounting to evidence of fraud, as a circumstance of hardship which would stay the interposition of the court.' Section 444: 'But it appears to have been established by the decisions of Lord Eldon and Grant, M. R., that mere inadequacy of consideration is no defense to specific performance unless it amount to an evidence of fraud, and so would furnish ground even for canceling the contract.' There follows the citation from Coles v. Trecothick, which has been already referred to.

"It will be necessary now to refer to the testimony to see whether there is such inadequacy of price here as in the words of Lord Eldon 'shocks the conscience and amounts in itself to conclusive and decisive evidence of fraud in the transaction.' Mr. Hertz, who had charge of the operations for the examination of this property, testifies that he had a plat prepared by Simons and Mayrant from the field notes, and this plat was sent on to the plaintiffs for their information. As this plat was prepared long before this litigation arose, and bears intrinsic evidence of considerable care in its preparation, there would seem to be grounds for accepting it as fairly representing the area of rock which the plaintiffs supposed to exist at the time when the contract was consummated by the payment of the purchase money. From this plat it appears that rock was found on 560.2 acres, at an average depth of 8.27 feet, and average thickness of 8.7 inches. In this area was included 126 acres which had already been mined by successive operators, but it appears from the testimony that some rock was still left in this mined area, how much is not definitely stated. The defendant, since the beginning of the hearings in this case, has had a survey made by Mr. Emerson and others, and their testimony is that there are 718.67 acres of phosphate lands, and plats prepared by Mr. Emerson were offered in evidence. These plats were criticised by witnesses for the plaintiffs, as containing no course and distances and no base lines, but it does not seem to be necessary for me to decide as to the relative accuracy of these surveys, inasmuch as Mr. Hertz, claiming to speak with authority as agent for the Bradleys, testified at the

last hearing that the plaintiffs were willing to accept the plat prepared by Simons and Mayrant, and give to the defendant all outside of it; that the plaintiffs did not want anything except what that plat called for; and the counsel for plaintiffs indorsed and reiterated this statement in his argument, so the plaintiff's rights will be limited to the area described in the plat prepared by Simons and Mayrant, that is to say to the 560.2 acres. The preponderance of the testimony is that there is about 500 tons of phosphate rock to the acre, and if we assume that there is the same average upon the 126 acres already mined there would be about 280,000 tons of phosphate rock upon the land, lying at an average depth of about 8.27 feet. A good deal of testimony has been offered as to the value of phosphate rock. The price of rock is fluctuating, and it is difficult to say what is a fair market price. Since the beginning of the hearings in this case there has been a drop in the price, owing, it is said, in part at least, to the discovery of new phosphate deposits in Florida, and it appears that the greater part of the phosphate territory in this state is under the control of two companies, the plaintiffs being one, and the Virginia-Carolina Chemical Company another, and as they are large manufacturers of fertilizers, most of the product appears to be consumed by these two companies. The testimony as to the royalty—that is to say, the price paid to the owners of lands for rock after it is mined—seems also to vary. At the Bolton mines 15 cents a ton is paid. Mr. Pinckney testifies that on the lands mined by him a royalty of 25 cents and 30 cents a ton is paid, with provision for an increase of royalty when the rock sells at a certain price, on a sliding scale. In the 'flush times' of the phosphate business as much as $1 a ton was paid. No direct testimony has been offered as to the value of the rock upon this land as it lies, except that of Mr. Pinckney, who gives it as his opinion that it is worth 25 cents a ton. If it is worth 25 cents a ton, and there are 280,000 tons, of course it follows that this deposit upon the Middleton lands would be worth $70,000. By the agreement between the parties the right to mine and remove this rock is subject to a timber lease, dated September 17, 1903, which gives to the lessees 15 years from date to remove the timber, with the right to five years' additional time upon certain conditions. As the value of growing timber, such as covers part of this land, is likely to increase from year to year, the probabilities are that the lessees will not remove the timber until near the time of the expiration of their lease, and the right to remove the phosphate, being subject to that lease, there is a possibility, a fair probability in fact, that the owners of the phosphate rock may not have the right to remove it for many years to come. It is true that, according to the testimony, a good deal of this land is not covered by timber, but as a great deal of the rock lies at a depth which will require expensive machinery in its excavation, and a provision for railways and washers, it would seem likely, as a business proposition, that the owners would not provide the plant necessary until the time was near at hand when their operations would not be incumbered by the timber lease, which, as already stated, does not expire until September 17, 1923. If that is so, and the plaintiffs should not come into the enjoyment of their purchase until 15 years after the payment of the purchase money, August 30, 1905, the sum of $20,000 already paid would at the legal rate of interest in this state be about doubled.

"It is impossible for me to say with any certainty what the value of this phosphate deposit will be 10 or 15 or 20 years hence. Its value consists in the presence of bone phosphate of lime, which, treated with sulphuric acid, is converted into a commercial fertilizer. For 15 or 20 years the mining of phosphate rock in this state was considered a very profitable industry. This industry was seriously affected by the discovery of phosphate deposits in the state of Florida, and the testimony is that the Florida phosphates were of much higher grade than those in this state, and that miners there pay 10 cents a ton royalty. Some years after the discovery of the Florida deposits valuable deposits were found in Tennessee, which at one time it was supposed would seriously affect the value of the South Carolina rock. While it is hoped and believed, and there seems reasonable ground for the hope, that the phosphate rock in South Carolina may always continue to have considerable commercial value, with the vast strides made by

science in the discovery of new material for fertilizers, it is a matter of speculation as to what the value of this rock will be at the time when these plaintiffs will be permitted, under their contract, to utilize it. It appears now that they have made a very good bargain, but it may possibly turn out that what now seems to be immensely valuable may not prove to be so profitable to them. At all events, with the lights before me, I cannot say that there is that gross inadequacy which 'amounts in itself to conclusive and decisive evidence of fraud in the transaction.' There is nothing in the contract or in the circumstances connected with it which raises any presumption of fraud. It does not fall within the class of cases such as McCabe v. Matthews, 155 U. S. [550, 15 Sup. Ct. 190, 39 L. Ed. 256], or Byers v. Surget, 19 How. [303, 15 L. Ed. 670].

"The next question to be considered is whether mere hardship alone, independently of any question of fraud, furnishes ground for refusing specific performance. Fry on Specific Performance, § 426, says: 'The cases which have been already quoted as showing that the hardship must be judged of at the time of the contract, also illustrate another obvious principle, namely, that where the hardship has been brought upon the defendant by himself it shall not be allowed to furnish any evidence against a specific performance of the contract, at least whenever the thing he has contracted to do is reasonably possible.' Now, the hardship here complained of is that the defendant should be compelled to execute conveyances for property which she sold for $20,000 and which she has since discovered to be worth a great deal more than that. Granted that she did not know at the time that there were 560 acres of her land underlaid with phosphate rock, yet it cannot be denied that means of knowledge were as open to her as to the plaintiffs, more so in fact, for she required the consent of no one to make the examination, while the plaintiffs could not go upon her land for that purpose without her consent. Her husband, under whose advice she acted, was a gentleman of unusual intelligence. He had as good opportunity to form an opinion as to what the land contained as the plaintiffs had, for it is not to be believed that the plaintiffs would have spent over $2,500 in making their examination if they had known beforehand where the rock was and its value, and there being a full, entire, and intelligent consent to the contract at the time it was made, and as related to a subject, the value of which was a matter of speculation, I can find no principle which has the sanction of English or American courts of respectable authority which would justify me in refusing a decree for specific performance. In the Roman law the case is different. The Constitution of Justinian fixed the arbitrary standard of one-half the real price as that which would give the sufferer the right to the interference of the court, and under the French Code a vendor may require rescission of the contract if he suffers injury to the extent of more than seven-twelfths of the price, but such is not the law of England or of any of the United States.

"Fry, § 446, says: 'The general rule, that the hardship of a contract is, independently of fraud, a ground for refusing a specific performance, would seem to carry with it the particular rule that inadequacy of consideration, when amounting to hardship, but not to fraud, could yet be a defense, but there appears (notwithstanding an expression of opinion from the bench to the contrary great good sense in refusing to adopt such a rule. To make a contract with an insufficient consideration, incapable of enforcement by the purchasers, would be practically to prevent a man from selling his property at less than its value, however impossible it might be to sell it at its value, however desirous he might be to sell it for the price actually obtained, however desirable it might be for his interest that he should do so, and however unwilling or unable the purchaser might be to purchase at its full value. The rule would, when it did not stop the sale, yet further reduce the amount receivable by the vendor, because the purchaser would in effect indemnify himself for the risk he ran by offering less purchase money than he otherwise would have done. The freedom of contract, including in it the freedom to enter into enforceable contracts, should never be infringed without sufficient cause; but, furthermore, if inadequacy of consideration short of fraud

were a bar to specific performance, the question would arise as to the amount of inadequacy which should so operate, a question not easy to answer.'

"I think that I have no discretion except to decree specific performance of this contract. While there are expressions in the opinions in many cases that a court of equity will not lend its aid in the enforcement of a contract where hardship or great hardship would result, I have found no well-considered case where relief from such contract has been granted, unless there were some circumstances outside of that of inadequacy which, taken in connection therewith, justified or required the court to withhold its aid. Some such expressions are found in the older cases loosely reported, where all the facts do not appear. The remarks of the Chief Justice in Union Pacific R. R. Co. v. C., R. I. & P. R. Co., 163 U. S. 600 [16 Sup. Ct. 1187, 41 L. Ed. 265], seem apposite: 'The jurisdiction of courts of equity to decree the specific performance of agreements is of a very ancient date, and rests on the grounds of inadequacy and incompleteness of the remedy at law. Its exercise prevents the intolerable travesty of justice involved in permitting parties to refuse performance of their contracts at pleasure by electing to pay damages for the breach. It must not be forgotten that in the increasing complexities of modern business equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has contrived its remedies so that they should correspond both to the primary rights of the injured party and to the wrong by which that right has been violated, and has always preserved elements of flexibility and expansiveness so that new ones may be invented or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed.'

"A few words as to the form of the decree. It should provide for the conveyance of the phosphate rock and phosphate deposit upon the lands containing 560.2 acres, described in the plat of Simons and Mayrant, filed in the cause. As to the location of the right of way for the railway or tramroad and the washer, let the decree direct a conveyance substantially in the form agreed upon between Mr. Von Kolnitz and Mr. H. A. M. Smith. This form of conveyance was produced under subpœna by Mr. Smith, but, upon objection of the defendant, the court reserved the question as to whether it was competent evidence, and upon motion of defendant's counsel the same was sealed and deposited with the clerk. I have not examined it, but as it appears to have been satisfactory to the counsel for plaintiffs, and was prepared by Mr. Smith, a kinsman and counsel of the defendant, and an eminent lawyer, I have no doubt that it makes such provision for the location of the right of way and site for the washer as is consistent with the rights of the defendant."

For the reasons herein stated, the decree of the court below is affirmed.