FRANCES P. MORGAN, PLAINTIFF AND APPELLANT, V. ALPHEUS HARDY, DEFENDANT AND APPELLEE.

1. **Specific Performance:** JURISDICTION. Courts of equity will not always enforce a specific performance of a contract. Such applications are addressed to the sound legal discretion of the court, and the court will be governed, to a great extent, by the facts and merits of each case, as it is presented. *Fish v. Leser*, 69 Ills., 394.

2. ———: ———. Specific performance will not be enforced unless the contract has been entered into with perfect fairness and without misapprehension, misrepresentation, or oppression, or where it will be unjust or inequitable to do so. *Id.*

3. ———: ———. When a contract concerning real estate is valid, unobjectionable in its nature and in the circumstance connected with it, and capable of being enforced, and it is just and proper that it be fulfilled, it is as much a matter of course for a court of equity to decree a specific performance as for a court of law to give damages for the breach of it. Waterman on Spec. Performance, § 6.

APPEAL from the district court of Lancaster county. Heard below before POUND, J.

*Harwood, Ames & Kelly*, for appellant.

*Marquett, Deweese & Hall*, for appellee.

COBB, CH. J.

This action was originally brought in the district court of Lancaster county, by Frances P. Morgan, plaintiff, against Alpheus Hardy, defendant, for the specific performance of a contract to sell land and execute a land contract therefor. The cause was tried to the court, which found the issues for the defendant and entered a judgment dismissing the plaintiff's petition at her costs. She brings the cause to this court by appeal.

The following is believed to be a fair statement of the

facts of the case so far as the same can be gathered from the record:

The plaintiff is a young unmarried lady, a step-daughter of Mr. Joseph L. Ryons, a farmer residing in the eastern part of Lancaster county, near Prairie Home post-office.

The defendant is an elderly man, residing in Boston, Mass. He is and was in the spring of 1880 the owner of a half section of land adjoining or quite contiguous to the farm of Mr. Ryons. Hardy and Ryons first met and became acquainted in the spring of 1880, when Mr Hardy visited the neighborhood for the purpose of inspecting his land, accompanied by his wife and daughter, and stopped for a few hours at the house of Mr. Ryons. At that time the defendant had no thought of selling his land, but intended to put it under cultivation. With this view he consulted Mr. Ryons. It seems from Mr. Ryons' testimony that some parties had been looking at the land with a view of purchasing it, and applied to Mr. Ryons to know if Hardy would sell it. This Ryons communicated to Hardy, who said in reply that his grandson would come out and live upon it.

It seems also that after Hardy returned home he wrote to Ryons asking him what he could have a hundred acres of the land broke up for. Mr. Ryons replied that it was not the season to break up land, but that he would attend to it the next year. In the spring of 1881, through the agency of Ryons, Hardy had a hundred acres of the land broken up and rented to a tenant at one dollar per acre per year. Mr. Hardy had also requested Mr. Ryons " to write to him occasionally, and let him know in regard to crops, as to the value of crops," etc.

I here copy the correspondence between Ryons and Hardy, which is relied upon as evidence of the contract of sale of the land in question by Hardy to the plaintiff:

(1)          " PRAIRIE HOME, NEB., Aug. 19, 1882.

" MR. HARDY: DEAR SIR—I suppose you are looking

Morgan v. Hardy.

for a letter from Nebraska, and one with something in the way of money. Well, it is coming; the crops have been fair so far harvested. The grain on your place is stacked, and when threshed and marketed I will send the money for the rent. I want to know what is your wish in regard to next year. Do you want me to rent for you? Rents are he same as last year—$1 per acre—although property is higher. If·you want to sell, I think it is a good time. Your land would bring $10 an acre cash. I will expect an answer to this as soon as you can, as the land will have to be ploughed this fall for crops next spring. The price of produce is very low: Wheat, 75c a bushel; rye, 42c; oats, 27c; potatoes, 20c; flax, 92c; butter, 12 to 16c a pound; eggs, 15c a dozen; corn looks good; wheat ave. 8 to 14 bushels to the acre; rye, do.; oats, 30 to 60; barley, 12 to 18; potatoes extra good; hogs are selling at 6 to 6.75 a hundred, live weight. We are all well, hoping you and your family are, likewise, with kind regards to all from all, I remain,       Yours truly,

"JOSEPH L. RYONS."

(2)                    "BOSTON, Sept. 4th, 1882.

"DEAR SIR—Yours of the 19th Aug., 1882, at hand. I will sell my land at $12 per acre, ¼ cash, balance on time, not exceeding five years; interest at 7 per cent, with equal yearly payments of interest and principal. If the purchaser prefers to pay all cash he may. If you do not send me an offer for a sale you may proceed and plow and rent the balance *at or better*—better if you can—than the terms of last year. I will vary terms of payment on a sale if desired by the purchaser. Send me *best terms* of purchaser and I will look at. it. Do you get any money for the grass on the unplowed lot for this year?

"Cordially yours,

"ALPHEUS HARDY.

"JOSEPH L. RYONS, Prairie Home, Neb., Lancaster county."

(3)                    "PRAIRIE HOME, Sept. 16, 1882.

"DEAR SIR—Yours of the September 4, 1882, received. I looked carefully over your statement and in reply will say, I had a gentleman from New York at my house ten days before I received your letter.   He was looking at a half section which was offered at $10 by an agent in town (the half of section 14).   It is a good piece of land. He did not buy when here  but left it with me to see after it.   The gentleman that owns it lives in Ill., and he wished me to find out his lowest cash price.   I have not been able to give it my attention as I have been very hard at work.   Just got through threshing my grain and haying this forenoon.   I have put up my hay—100 tons— 1,800 bushels of oats, 120 barley, 125 wheat.   If you sold your land for $10 cash it would be thirty-two hundred dollars, and you would  have the use of the money; if invested at 7 per cent would  be $224.   If you sold for $12 it would be $3,840.   That you can not do this year.   (It might bring it next year, and it might not).   You understand how things fluctuate, and then if you sold through an agent they would charge you 5 per cent commission for selling, at least, and that would be $172, then the taxes, I suppose, is $50;  deducting them from $3,840—$446, =$3,394, so the difference is small.   I will not take any further action on the land mentioned till I hear from you. I did not suppose you would sell, as I suppose some of the grandchildren would come out and then we would have neighbors.   Of course I would not charge you any commission on a sale; my advice would be to sell for this price, cash.   There was two 80 acre farms on your section sold this spring—one 80 with 10 or 15 acres under cultivation sold for $6—the other with 40 or 50 acres under cultivation sold for $750 cash sales.   If the land should advance this year will it advance the interest on the money? that, of course, it will take some time to tell.

                            " Yours truly,

                                "JOSEPH L. RYONS."

(4)                          "BOSTON, Sept. 15th, 1882.

"DEAR SIR—I withdraw my land from sale as I do not wish to sell at present.

                    "Yours truly,
                              "ALPHEUS HARDY,
                                   "By W. A. SNOW."

"Mr. JOSEPH L. RYONS, Prairie Home, Neb."

(5)                          "LINCOLN, Sept. 19th, 1882.

"MR. HARDY: DEAR SIR—I have sold your farm to a party on your terms, 1-4 cash, balance on time, not to exceed five years. I hold a $500 U. S. Bond (4) as a deposit. Please to inform me how to send the money?

                              "Yours,
                                   "JOSEPH L. RYONS."

(6)                          "BOSTON, Sept. 23d, 1882.

"DEAR SIR: On the 13th inst. I wrote you withdrawing my land from sale. That letter you should have received on the 18th, not later than the 19th, the date of yours last received to-day. Before making any other plans I wanted to hear from you. On the 19th I received yours of the 16th, in which you say, referring to my price, "that you can not do this year;" and then you add, "I *will not take any further action on the land mentioned till I hear from you.*" On receipt of this I made other plans for my land; as you had no authority to sell I must refuse to confirm the sale you report.

                    'Yours truly,
                              "ALPHEUS HARDY."

"J. L. RYONS, Prairie Home, Neb."

(7)              "PRAIRIE HOME, NEB., Oct. 6, 1882.

"MR. HARDY: DEAR SIR—Yours of 23d of Sept. received on September 30 (Saturday), Tuesdays and Saturdays are our mail days. Sometimes it lays over to next mail day which was the case in the letter of the 23d inst. Your letter of the 23d is a surprise to me. In your letter

of 4th of Sept. you say you will sell your land for the figures and terms mentioned therein. I acted as your agent accordingly. The land on which I was to take no action was the half section mentioned in my letter belonging to a Mr. Betts, of Illinois. Still, as your agent, I find a customer for your land at your own terms, which I accepted; and to make it more secure for you I received a deposit which I hold to your credit. For what I know of the sale of land out here I consider you have done well, and hope you will reconsider and confirm my sale, as I have acted in all good faith on your word.

" P. S. Will you please send me a copy of my letter of the 16th inst.

" Yours truly, .

" JOSEPH L. RYONS."

(8)                        " BOSTON, Oct. 11th, 1882.

" MR. JOSEPH L. RYONS: DEAR SIR—Yours of the 6th is at hand. I deeply regret that you should have acted as you did after writing me on the 16th. [Enclosed is a copy of that letter."] [This copy introduced in evidence before.] " When you wrote me that my price could not be had, and argued for and asked for other terms, you left me free to do what I pleased; but when you added in connection with your request for other terms, that you should ' not take any further action on the land mentioned till I hear from you,' I knew of no other land that you was to hear from me about but my own. So soon as I received yours of the 16th stating that you could not sell at my price, I wrote you, withdrawing my land from sale, and made other plans regarding it. Had you not said you should wait to hear from me, the fact that you wrote me that you could not sell at my price ' this year,' left me free to act in any other way, and you should in the exercise of ordinary business caution, at least, have waited until you heard from me in answer to your statement, that my terms could not be had. I doubt not, dear sir, that

you have acted in good faith, but had you kept a copy of your letter, and read it, you would have seen that you should have waited for my answer to yours of the 16th before acting at all.

"Cordially yours,

"A. HARDY.".

(9)  "BOSTON, MASS., Oct. 13, 1882.

"MR. JOSEPH L. RYONS: DEAR SIR—I wrote you on 11th defining your position and mine on the sale of land. After the receipt of yours of the 16th Sept., I made other plans for the disposition of my land. Those plans I have canceled by use of telegraph, and now with the feeling that you, while misleading me by your letter of the 16th, have acted in good faith, I am willing, though entailing a loss on me, to receive from you the terms of sale of my land, the name of the purchaser, etc., when I will make the papers. You may send me the one-fourth cash in any good draft on Boston or New York. If you have forms of bond for deed send one; if not I will have one drawn here. No one without your explanation could suppose that you referred to any other land than mine when you wrote you should not act without hearing from me again; but with your explanation, and feeling that you thought you were serving my interest, I now write this.

"Cordially yours,

"A. HARDY."

(10)  "PRAIRIE HOME, Oct. 24, 1882.

"MR. HARDY : DEAR SIR—Yours of the 13th of October received on Saturday, 21 of October. I will go to town to-morrow or next day, and will attend to your business. I will get papers and send to you. Will attend to the money when I find out the best way to send it to you. The weather is pleasant just now. We are all well, hoping you and yours are likewise.

"JOSEPH L. RYONS.

"P.S. The parties who had your land last year have

30

not threshed yet.   Grain is low and he has no place to store it so he has to keep it in the stack till the markets get a little better.   Wheat is only 60 to 70c a bushel.   It does not pay to raise it at that."

(11)                    " LINCOLN, NEB., Oct. 26, 1882.

" MR. HARDY : DEAR SIR—As stated in my letter of the 24th, I am in town to-day.   I went to see a lawyer about the papers.   He said to me that you had better send them to the bank, or any one you wished here to be delivered on payment of the amount mentioned.   I hold in my possession now a $1,000 U. S. bond, coupon 4 per cent, which is to be the first payment.   The balance in equal payments for the five years unless purchaser wishes to pay off sooner which I presume meets your approval. The bond now is rated 19½.   If you prefer the bond I will send it, or sell it and deposit the money until you send the necessary papers.   Bond and premium will be about $1,200, which is the amount the parties will pay as first payment, the balance on time as stated.

" Yours etc.,

" JOSEPH L. RYONS.

" Name, F. P. Morgan, of Lancaster Co., Neb."

(12)                    " BOSTON, Nov. 3d, 1882.

" DEAR SIR—Yours of the 26th ult. at hand.   Enclosed is my agreement to sell (a copy of the usual printed agreement in use in Neb.), which you may have signed by Mr. Morgan and witnessed ; then send it to me with a remittance of $960, and I will sign it and send Mr. Morgan a copy signed by myself.   The date should be the date of your sale, say 19th Sept.; but I have left it blank to get your views.   I do not want the U. S. bond.   You may therefore send me the $960, or you may send the bond, and I will sell it here at full price and remit you the balance.                    "Yours truly,

" ALPHEUS HARDY.

" Mr. JOSEPH L. RYONS, Prairie Home, Neb."

(13)                    "LINCOLN, Nov. 13th, 1882. ·

"MR. HARDY : DEAR SIR—Enclosed please find a bond for $1,000, and the agreement. I supposed you would have sent to the bank or to some one in town of Lincoln. You will please to sign and return to me, and send the money in a certificate of deposit, and I can have it cashed in the bank here (in which I do business). You had better date it the first of October, 1882. That will be dividing time.

"JOSEPH L. RYONS."

(14)                    "BOSTON, Nov. 21, 1882.

"DEAR SIR—Yours of the 13th with U. S. bond at hand. I have sold the bond for $1,192.50, and now return to you check for $232.50, balance of over $960 due me for first payment. I have accepted your date Oct. 1st, and you have my acknowledgment for $960. Please have Mr. Morgan sign the enclosed completed agreement, and I will have another made and sign it first, and send that to you so soon as you can square last year's acct. with the parties working my land. Please forward proceeds.

"Cordially yours,

'"ALPHEUS HARDY.

"J. L. RYONS, Prairie Home, Neb."

(15)                    "BOSTON, December 7, 1882.

"Mr. JOSEPH L. RYONS, Prairie Home, Neb. : Sir—I have received from W. H. Snelling, of Lincoln, Neb., the paper I sent you for the signature of one Morgan, whom you have represented to me as the real purchaser of my land. For reasons which are based upon information recently received, as well as upon the unsatisfactory tone of your latest letters, I return the paper to Mr. Snelling unsigned, and now return to you the sum you sent me as first payment. Here, this to me, most *painful* and disappointing transaction must end. This action is dictated more from self-respect than pecuniary interest.

"Yours etc,

"ALPHEUS HARDY."

The following is a copy of the certificate of acknowledgment to the article of agreement sent to defendant for execution on his part, and returned by him unexecuted to Mr. Snelling, the notary taking said acknowledgment, as per letter of defendant to Ryons, under date December 7, 1882.

"(Venue.)   On this second day of December, A.D. 1882, before me, W. H. Snelling, a notary public duly commissioned and qualified for and residing in said county in the state aforesaid, personally came F. P. Morgan (unmarried), to me known to be the identical person described in and who executed the foregoing conveyance as grantor, and acknowledged the said instrument to be her voluntary act and deed.   Witness my hand and notarial seal the day and year last above written."   (Seal and signature of notary.)

Reading this correspondence in the light of the fact that the proposed purchaser of the land was an unmarried young lady, a ward and step-daughter and member of the family of the agent, it is quite evident that the defendant was worked upon and deceived by his agent into giving his consent to the transaction, and while his letters to the agent and his receipt of the bond and converting it into money would under other circumstances be held to be binding upon him, and to take the case out of the statute of frauds, yet we think there is sufficient evidence of *suppressi veri*, if not of *suggestia falsi* in the above correspondence on the part of the agent, to justify the defendant, upon the discovery of the identity of the intended purchaser, in breaking off the negotiation and refusing to carry it into effect.   In his testimony the agent, Ryons, denies the receipt of defendant's letter of the 15th Sept., 1882.   Whether he did or not is of little consequence, as it must be conceded that it was upon a false pretense of having incurred an embarrassing responsibility to the purchaser in making the sale, that the defendant was induced to partially consent to the sale, but which consent

he withdrew upon discovering the identity of the purchaser. There is an evident want of candor, if not of truth, in the statement of the agent that he tried to dissuade his step-daughter from buying the land, when his letters show that he was using labored arguments to induce the defendant to sell, and he admits that he never had any other purchaser in view.

When a professional land agent acts as agent for both the seller and the buyer, and that is known to them, the law exacts the most perfect good faith, honesty, and fairness on his part, and will not adjudge the specific performance of a contract thus made unless it has been entered into with perfect fairness and without misapprehension or misrepresentation, and this rule will be all the more strictly observed in a case like the one at bar, when the vendor believed and had the right to believe that the agent was acting for him and in his interest alone. No one who reads the above correspondence can doubt that the agent was acting alone in the interest of his step-daughter. Indeed, in all matters where her interest was at stake it was his duty to protect it. Hence, in the transaction now being considered he was morally if not legally incompetent to act as the agent of the defendant.

The law prohibiting judges and jurors from sitting in a case where relatives or members of their families are parties because it will not place a person in a position of divided allegiance or duty, and while it takes no notice of private transactions until the same are brought before a court, yet when a party comes into court and seeks to enforce the specific performance of a contract made through an agent, and it appears that such agent acted as the agent of both parties, and that the party seeking to enforce such contract is a relative, connection, or member of the family of such agent, the court will look with great suspicion and disfavor upon such claim, and it will only be allowed when it proves to be absolutely fair, free, and clear of misrepresentation or concealment.

A person selling a valuable piece of land, mostly on time, would usually, if not always, take into consideration the age and sex, as well as the character and habits of the purchaser. To fail to do so would be unbusiness-like and imprudent. So that if in the case at bar, the name and sex of the purchaser had been studiously concealed from the defendant up to the time when the contract was presented to him for execution, and he then discovered the same to be a female, and by seeing her name in the instrument, recognized her to be a member of the agent's family, he had a right to refuse to go further and rescind the contract, although a payment had been made and received on it. In that case, of course, the parties must be placed as near as possible in *statu quo*.

As is well said by Mr. Justice Craig, in the case of *Fish v. Leser*, 69 Ill., 394, "Courts of equity will not always enforce the specific performance of a contract. Such applications are addressed to the sound legal discretion of the court, and the court must be governed, to a great extent, by the facts of each case as it is presented." While when a contract concerning real estate is valid, unobjectionable in its nature, and in the circumstances connected with it, and capable of being enforced, and it is just and proper that it should be fulfilled, it is as much a matter of course for a court of equity to decree a specific performance as for a court of law to give damages for the breach of it. I think there was no abuse of legal discretion on the part of the district court in refusing the relief prayed by the plaintiff, nor in dismissing her petition.

The judgment of the district court is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.