ROBERT E. MOORE, PLAINTIFF, v. PATRICK E. McKILLIP ET AL., APPELLEES: LOUIS A. BERGE ET AL., APPELLANTS.

FILED JUNE 27, 1923. No. 22454.

1. **Specific Performance:** DEFENSES: INADEQUACY OF CONSIDERATION. Inadequacy of consideration alone is no defense to specific per-

formance of a contract, unless so great as of itself to furnish an irresistible inference of fraud.

2. ——: ——: ——. Inadequacy of consideration, although not sufficient of itself, accompanied by circumstances suggesting fraud or mistake inducing the assent of one of the parties, is an important factor upon the question of the specific enforcement of a contract.

3. ——: MISTAKE: REFUSAL OF RELIEF. It appearing that defendant signed the contract under mistake as to its subject-matter, and that to enforce the contract would be unjust and inequitable, a court of equity in the exercise of a sound judicial discretion may refuse specific performance, even though plaintiff was in no way connected with or responsible for defendant's mistake.

APPEAL from the district court for Lancaster county: ELLIOTT J. CLEMENTS, JUDGE. *Affirmed.*

*McCarty & Hager* and *P. N. Johnston,* for appellants.

*Albert & Wagner, contra.*

Heard before LETTON, ROSE, DAY and ALDRICH, JJ., REDICK, District Judge.

REDICK, District Judge.

This is an action in equity for the specific performance of a contract for the exchange of certain lots with an apartment house thereon, in the city of Lincoln, for 160 acres of land in Iowa. The case is presented upon a cross-petition by Louis A. and Josephine B. Berge, filed in an action to foreclose a mortgage upon the Lincoln property, in which Patrick E. McKillip and others are named as defendants. For convenience the parties will be referred to in this opinion as Berge, plaintiff, and Mc-Killip, defendant.

The plaintiff alleges that on September 11, 1919, a written contract was entered into by the parties whereby plaintiff agreed to convey to defendant clear a certain 160 acres of land in Iowa, in exchange for the Lincoln property subject to a mortgage of $6,000; that plaintiff delivered an abstract of the land to defendant, and on June 23, 1920, executed and delivered a deed of said lands to defendant, who retained and still retains the

same but refuses to convey the Lincoln property to plaintiff.

The defendant answered the cross-petition, admitting the execution of the contract, but averring "that he was thereunto induced by means of false and fraudulent representations made by the said cross-petitioners, their agents and others acting for them and in their interest," to the effect that the soil on the land so to be conveyed "was black sandy loam, productive and fit for cultivation and agricultural purposes; that 130 acres thereof was what is known as second-bottom land and the remainder first-bottom; that the Missouri river never flowed over, on or across any portion thereof and had never been nearer to said land than one and one-half miles; and was worth $16,000;" that said representations were false, and " that within recent years * * * all of the said land, excepting about 55 acres, had been covered by the said river and had formed a part of the bed thereof, in consequence whereof all of the said land, excepting about 55 acres, is sand, totally unproductive and unfit for cultivation and agricultural purposes, and the whole of the said land is not, and never has been, worth to exceed $2,000;" that the Lincoln property was worth $24,000; that upon discovery of the facts defendant repudiated and rescinded said contract, and now offers to return the deed and do any other act required by the court. Defendant further alleges that he signed said contract under mistake of fact as to the location, character, quality and value of said land, as above detailed, all of which, except about 15 or 20 acres, consists of white sand and gravel, subject to overflow and unfit for cultivation.

The facts alleged in the answer were put in issue by a reply, in which it was further alleged that defendant by himself and his agents examined said land and were fully advised as to its nature, location, quality and value.

Findings of fact were filed by the trial court, which may be summarized as follows: (1) That the defense

of false representations was not made out, finding for
plaintiff on said issue of fraud: (2) that only about 60
to 65 acres of said land were tillable, the remainder
being part of the old bed of the Missouri river and of
little value; (3) that the value of the land did not ex-
ceed $3,000, and of the Lincoln property, not less than
$7,000 above incumbrances; (4) that at the time of
entering into said contract said McKillip understood
and believed that said quarter section of Iowa land
contained 130 acres of good, tillable land, and that only
30 acres thereof had ever been a part of the bed of the
Missouri river, and that its value was equal to or greater
than the value of the Lincoln property; (5) that said
understanding, belief and mistake of said McKillip was
induced and caused by the statements and representations
of his agents, who examined the land and on whom he
relied; (6) that if the land had been as understood by
McKillip it would have been worth nearly as much as
the Lincoln property; (7) that upon discovery of the
truth said McKillip refused to proceed with the deal
and so informed plaintiff by letter of November 24, 1919;
(8) that June 23, 1920, plaintiff mailed to McKillip a
deed to the land, which McKillip did not intend to and
did not in fact accept, and tenders the same to plaintiff.

As conclusions of law the court found: (1) That plain-
tiff was not guilty of fraud or misrepresentation, and
McKillip was not entitled to rescind: (2) that to decree
specific performance is within the legal discretion of the
court; (3) that, although a contract may be legal and
enforceable at law, equity will not decree specific per-
formance thereof unless it be just and fair in all its
parts and not hard or unconscionable, nor unless it was
entered into without misapprehension or mistake, where
it would be unjust or unfair to require such per-
formance; (4) a general finding for defendant.

Plaintiff appeals to this court, assigning a number
of errors which need not be particularized.

It would extend this opinion to an unreasonable

length to quote and analyze the evidence, so we must be content to state our conclusions therefrom with such references thereto as seem necessary to sustain such conclusions.

Louis A. Berge, husband of plaintiff, was a dealer and trader in lands and other real estate, and resident in Lincoln. Patrick E. McKillip was in the same business at Humphrey, Nebraska. R. C. Alderman was a real estate broker in Omaha, not connected with either of the parties, but making deals upon commission. F. G. Kloke was in the employ of McKillip on a salary, engaged in looking up deals and inspecting properties to be dealt with.

The principals to the contract had no personal contact. The circumstances resulting in its execution were as follows. Alderman knew of Berge's ownership of the land through his connection with the deal by which Berge traded for it two tracts, one of 640 acres and the other 480 acres of land in northwestern Nebraska. He also knew of McKillip's Lincoln property from a list put out by McKillip. He suggested to Kloke that a trade might be made, and they went to inspect the land late in August, 1919, and again early in September, when Kloke, having reported to McKillip, on September 10 notified Alderman that the trade could be made. On September 11 Alderman first approached Berge on the subject, at Lincoln, and after an inspection of the apartments went to the office of Berge's attorney and had the contract prepared and signed by Berge; Alderman delivered it to Kloke, who mailed it to McKillip, and he, after executing it, mailed a copy back to Kloke.

Alderman represented no one but himself, his only interest being to secure a $640 commission from McKillip. Upon the occasion of the visits to the land, it seems from his evidence Alderman was very careful not to make any representations as to its character or value. He says that, when asked by Kloke how much of it was bench land, he answered: "I don't know; I never

measured it; I know nothing about it, but here is your east line and there is your north line, you can tell from that." "I couldn't tell him there was 80 acres. It would have been guesswork if I had told him. I did not." Later on he testified all but 65 or 70 acres was in the old river bed. Kloke says Alderman told him only about 15 or 20 acres were in the river bed, and he so estimated it. An unsuccessful effort was made to show that Kloke was shown the wrong land; but however this may be, it appears that he was grossly mistaken as to a number of important facts concerning the land. For example, he thought there was a two-story house and small orchard on the southeast corner of the land, but this turned out to be on adjoining property, and his estimate of 15 or 20 acres of old river-bed land was quite out of line, as it is practically beyond dispute that not to exceed 65 acres were on the bench, and of this 10 or 15 acres were very sandy.

There can be little doubt but that Kloke was materially deceived as to the vital questions concerning the land, not so much perhaps by any active misrepresentations of Alderman as by Alderman's refusal or failure to call attention to facts within his knowledge and by his own failure to exercise that degree of care and judgment, while inspecting the property, which his employer, McKillip, had a right to expect. To say the least, McKillip was extremely unfortunate in the selection of his agent. Kloke reported his misinformation as to the land to McKillip, who signed the contract in reliance thereon. Had Alderman been the agent of Berge, there would be little difficulty in finding that the contract was procured by unfair means; but as Berge was not responsible for Alderman he cannot be held for Alderman's fault, and it was in this view of the matter, we take it, that the district court found against defendant on the issue of fraud.

Defendant realized the difficulty just referred to, and during the trial obtained leave to amend his an-

swer by setting up that McKillip entered into the con-
tract under a mistake of fact, as hereinbefore set forth,
and that it would be inequitable to enforce the same.
The finding and decree of the lower court was for de-
fendant on this issue.

Upon a careful study of the record, we are convinced
that when he signed the contract McKillip understood
and believed that only about 15 to 20 acres of the land
had ever been a part of the old river bed. Kloke drew
and gave McKillip a rough plat of the ground, which
showed the then location of the Missouri river, also the
old bank, by an irregular line across the western portion
of the tract depicted as two eighties. While in fact one
lay west of the other and they were in the usual oblong
shape, the two eighties were shown one north of the other
and in square form, instead of oblong, and plaintiff
claims that the plat represented the eastern eighty and
correctly shows the old bank, with the result that de-
fendant must have known that all land west of the ir-
regular line (about 100 acres) had been a part of the
river bed. We think the claim untenable. The plat
purports to cover two eighties, and the exterior bounda-
ries are plainly drawn, and the line of the old river bank,
inclosing about 20 acres, is shown near the west boundary
of the tract as drawn. The natural thing to do was to
draw the exterior boundaries of the tract, and then
show any special features within the same. To sustain
plaintiff's contention would require us to find that Kloke
did a most unnatural thing—drew a plat of only one-
half the land—and to extend the lines according to
the plaintiff's theory, so as to show the entire tract,
would place the west boundary less than one-half mile
from the river, while the words on the plat and the
other evidence fix it at about a mile and one-half. In
addition to these considerations, Kloke testifies that the
west line on the plat was intended by him to represent
the west line of the tract.

The clear weight of the evidence sustained and re-

quired the findings of fact of .the district court.   Defendant's mistake is not chargeable to plaintiff, nor to his own negligence, but to the failure of his agent to make adequate inspection of the land and report the actual conditions; such failure being at least partly due to his placing too much reliance upon Alderman.

Under these circumstances will a court of equity specifically enforce the contract, or should it exercise its discretion and refuse?        .

Inadequacy of price alone is not sufficient to prevent a decree, unless the disparity is so great as to shock the conscience of all reasonable men and thus afford an irresistible inference of fraud.   Such a case was *Byers v. Surget,* 19 How. (U. S.) 303, where defendant attempted to sustain a public sale for $9.75 of land worth from $40,-000 to $70,000. That was an extreme case, but serves to illustrate the general rule, which arose partly from the difficulty of determining by any definite standard what amount of inadequacy must exist to constitute the exception.

The general rule is announced in the cases cited by plaintiff, *inter alia, Heyward v. Bradley,* 179 Fed. 325; *Boyce v. Holloway,* 45 Ind. App. 535; *Sweeney v. Brow,* 35 R. I. 227.   In all of these cases, however, and in all coming to our attention, it is recognized that the rule is applicable only in the absence of fraud, oppression or mistake.   Where inadequacy of price is shown, though insufficient in itself, if accompanied by circumstances fairly establishing fraud or mistake, a case is presented for the exercise of a sound judicial discretion by the court.

The circumstance that plaintiff was not in any way responsible for the mistake does not deprive the court of jurisdiction to grant relief on such ground in this class of cases.   In Kerr on Fraud and Mistake, p. 411, the doctrine is stated:   "A court of equity will, however, in many cases refuse to grant a plaintiff the peculiar remedy of specific performance of a contract, which the defendant has entered into under a mistake, al-

though plaintiff was not privy to the mistake, nor implicated in its origin. A man who seeks to take advantage of the plain mistake of another cannot come to a court of equity to assist him in doing so, but must rest satisfied with the remedies which a court of law will give him." And 2 Pomeroy, Equity Jurisprudence (3d ed.) sec. 860: "A mistake which is entirely the defendant's own, or that of his agent, and for which the plaintiff is not directly nor indirectly responsible, may be proved in defense, and may defeat specific performance. This is indeed the very essence of the equitable theory concerning the nature and effect of mistake." See, also, *Somerville v. Coppage,* 101 Md. 519; *Kelley v. York Cliffs Improvement Co.,* 94 Me. 374; *Cawley v. Jean,* 189 Mass. 220; *Clitherall r. Ogilvie,* 1 Desaus. Eq. (S. Car.) 250.

The case principally relied upon by plaintiff is *Heyward v. Bradley, supra.* The case is illustrative of the tenacity with which the rule of mere inadequacy of consideration is adhered to. The subject of the contract was lands supposed to contain deposits of phosphate rock, but the existence of which could only be determined by prospecting involving considerable expense. The option was negotiated between two lawyers (one the husband of defendant), with the expectation that plaintiff would explore the lands at his own expense, and if paying deposits were found the option would be taken up, otherwise not. The defendant was perfectly familiar with the land. The only unknown feature was the phosphate content, the possibility of which gave it a value far beyond what it would otherwise have; in fact, only the mineral content was covered by the option. By the plaintiff's expenditure of over $2,500 it was manifested that there were phosphate deposits to the extent of 280,000 tons, which, when mined, would have brought defendant $70,000 in royalties, whereas she received but $20,000. At page 328 it is said: "Neither at the time the money was paid nor at any other time prior to the commencement of this suit, so far as appears from the rec-

ord, was there any contention that there had been any mistake." And the court stated the question to be (p. 329): "Shall the plaintiffs be deprived of the benefits of a contract, fair and unobjectionable at the time it was made, because it has turned out that as a result of their enterprise and expenditure a much larger quantity of rock has been discovered on the land than the defendant believed to be there at the time the contract was made?" There were no circumstances or appearances calculated to mislead defendant or create in her mind a mistaken belief as to the fact; the parties were dealing with an unknown quantity, with equal opportunity to form an opinion; the conditions were known, and the only mistake, if any, under which defendant labored was one of judgment, rather than of fact. The case is naked of any material with which to decently clothe the discretion of the chancellor, and so, with becoming modesty, he allowed it to remain in the privacy and seclusion of his unawakened conscience.

The instant case presents many different features. It is beyond question defendant was mistaken as to the quality of the land (his counsel refuses to classify it under this term, insisting that "*sand* is not *land*"). It was traded at $16,000, while its value at the highest estimate of real estate men was fixed at $3,000. Plaintiff offered no evidence except his own on this point, fixing it at $100 an acre. The evidence is conclusive that not over 60 acres were tillable, and the remainder practically valueless. On the other hand, defendant's property, at the lowest estimate of a loan man, was worth $13,000. The sum of $6,000 was borrowed upon it, which on the basis of 40 per cent, would indicate a value of $15,000. It produced an income of $135 to $185 a month, warranting a still higher estimate; and it was located across the street from the courthouse. Plaintiff had himself seen defendant's property, while defendant had not personally inspected that of plaintiff. Plaintiff, who is presumed to have known the quality of his own property, places

upon it a price of $16,000, which was more than five times its value. He was evidently unable to secure disinterested witnesses to place its value at his own figure. He accepts the services of Alderman without inquiry as to the means by which the contract was secured, was notified six months before any effort was made to close the deal, by exchanging deeds, that defendant claimed to have signed the contract under mistake and refused to go on; and now comes to a court of conscience asking it to assist him by compelling defendant to convey property of a clear value of $7,000 to $8,000 for $3,000. Can such a contract be truthfully characterized as "just and fair in all its parts," or fair and unobjectionable at the time it was made? We think not. "However strong, clear and emphatic the language of the contract, however plain the right at law; if a specific performance would, for any reason, cause a result, harsh, inequitable or contrary to good conscience, the court should refuse such a decree and leave the parties to the remedies at law. In an equity proceeding, the complainant must do equity and can obtain only equity." *Kelley v. York Cliffs Improvement Co., supra.*

In *Griffin v. Nash,* 187 Ia. 345, it was said: "Specific performance of a contract is seldom a matter of right, and should not be granted in aid of a party seeking to enforce an unjust or an inequitable contract"—citing *Smith v. Shepherd,* 36 Ia. 253; *Auter v. Miller,* 18 Ia. 405.

This language is applicable to the case at bar; the decree of the lower court is right, and is

AFFIRMED.