JOHN P. MAINELLI, APPELLANT, V. JOHNNIE H. G. NEUHAUS ET AL., APPELLEES. CONSOLIDATED WITH JOHN P. MAINELLI, APPELLEE, V. JOHNNIE H. G. NEUHAUS, APPELLANT, IMPLEADED WITH ANNA C. NEUHAUS ET AL., APPELLEES.

59 N. W. 2d 607

Filed July 10, 1953. Nos. 33301, 33302.

*White, Lipp & Simon* and *Ralph W. Hetzner,* for appellants.

*Leonard A. Hammes,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

John P. Mainelli brought this action in the district court for Douglas County against Johnnie H. G. Neuhaus, Anna C. Neuhaus, Harry Neuhaus, and Chris Dillon. The object of the action is to obtain an order of that court requiring defendants Anna C. Neuhaus and Johnnie H. G. Neuhaus to specifically perform their written contract whereby they sold to E. K. Corrigan their interests in certain real estate situated in Douglas County, which contract Corrigan had assigned to the plaintiff. Defendant Johnnie H. G. Neuhaus, by his answer, stated he was ready and willing to perform under the terms of the contract and asked for the same relief as was asked for by plaintiff by joining in the prayer of the latter's petition. The trial court, on the issues raised, found generally in favor of defendants Anna C. Neuhaus, Harry Neuhaus, and Chris Dillon and against the plaintiff and the defendant Johnnie H. G. Neuhaus. It thereupon dismissed the petition of plaintiff, denied the prayer of plaintiff and defendant Johnnie H. G. Neuhaus for specific performance, and cancelled of record the contract filed in the office of the Register of Deeds in Douglas County in book 259 of Miscellaneous Records at pages 241 and 242. Plaintiff and defendant Johnnie H. G. Neuhaus thereupon filed separate motions for new trial. These motions the court overruled and each of the par-

ties appealed therefrom. The appeals were consolidated in this court for the purpose of avoiding a duplication of the record and briefs. Since the relief asked for by the appellants is the same and since it arises out of the same contract the issues presented will be disposed of by one opinion.

"As a general rule, the assignee of the purchaser's interest in a contract for the sale of real estate may maintain a suit in his own name against the vendor to enforce specific performance of the contract, if the vendee himself, but for the assignment, could have obtained such relief, * * *." 49 Am. Jur., Specific Performance, § 150, p. 173.

The real estate involved is the northeast quarter of Section 7, and the south half of the northwest quarter of the northwest quarter of Section 8, consisting of 180 acres, all in Township 15, Range 12, in Douglas County, Nebraska. This land is located at 123rd and Maple Streets which is about 4 miles west of the city limits of Omaha, Nebraska.

The appellees Harry Neuhaus and Chris Dillon were made parties to this action because of any rights they might claim in and to the northeast quarter of Section 7 by reason of being in possession thereof under and by virtue of a written lease entered into with appellee Anna C. Neuhaus dated March 2, 1951. This lease is for 1 year, extending from March 1, 1951, to February 29, 1952. Since the question of the validity of this lease and the rights of these appellees thereunder do not become material to a determination of the rights of the parties to the agreement which is herein being sought to be enforced, they, and their rights thereunder, will not again be referred to.

For convenience we shall herein refer to appellant John P. Mainelli as Mainelli, to appellant Johnnie H. G. Neuhaus as Johnnie, and to appellee Anna C. Neuhaus as Anna.

This action, being equitable in its nature, will, on ap-

peal to this court, be tried de novo in conformity with section 25-1925, R. R. S. 1943. See, Kear v. Hausmann, 152 Neb. 512, 41 N. W. 2d 850; Sopcich v. Tangeman, 153 Neb. 506, 45 N. W. 2d 478.

By the terms of the contract, which is dated February 1, 1951, Anna and Johnnie sold their interests in this land to E. K. Corrigan for a consideration of $38,700. Therein they agreed to convey to the purchaser, by February 10, 1951, a good marketable title in fee simple and to give him possession thereof on or before February 15, 1951. The contract further provides that their interests are to be clear of all liens and encumbrances except "the interest of Edith Neuhaus as provided in the Will of John Neuhaus requiring payment of $800.00 a year to Edith Neuhaus during her lifetime and Edith Neuhaus is to pay the tax from said $800.00 during her lifetime." Of the purchase price only $50 was to be deposited upon the execution of the agreement. After Anna was asked to execute a deed in accordance with the terms of this contract, and refused, Corrigan, for a consideration of $50, assigned all his interests therein to Mainelli, who, at the time, was aware of Anna's refusal to perform.

The principal question involved by this appeal is whether or not under all of the facts and circumstances disclosed by the record a court of equity should decree specific performance of this purchase agreement.

When land, or any interest therein, is the subject matter of an agreement the power of a court of equity to enforce specific performance thereof is beyond question. See, Bennett v. Moon, 110 Neb. 692, 194 N. W. 802, 31 A. L. R. 495.

But such equitable remedy is not a matter of right but one that may be granted by the court in its sound judicial discretion, controlled by established principles of equity and depending upon the facts and circumstances of the particular case. It is not a discretion in the sense that it may be granted or denied at the will

or pleasure of the judge. It is governed by the elements, conditions, and incidents that control the administration of all equitable remedies. See, Garsick v. Dehner, 145 Neb. 73, 15 N. W. 2d 235; Wiiest v. Pounds, 142 Neb. 882, 8 N. W. 2d 211; Mercer v. Payne & Sons Co., 115 Neb. 420, 213 N. W. 813; Morgan v. Hardy, 16 Neb. 427, 20 N. W. 337.

We have said of this remedy:

"Specific performance will not be enforced unless the contract has been entered into with perfect fairness and without misapprehension, misrepresentation, or oppression, or where it will be unjust or inequitable to do so." Morgan v. Hardy, *supra.*

"Where it appears that a plaintiff, who brings a suit in equity to enforce a specific performance of a contract, has obtained such contract by sharp and unscrupulous practices, by overreaching, by concealment of important facts, even though not actually fraudulent, by trickery, or by any other unconscionable means, he will be denied affirmative relief." Blondel v. Bolander, 80 Neb. 531, 114 N. W. 574.

"We have frequently held that specific performance is not generally a legal right, but is directed to the sound legal discretion of the court, and it will not be granted where its enforcement will be unjust." Wineberg v. Baker, 123 Neb. 411, 243 N. W. 122.

"The specific performance of a contract by a court of equity is not generally demandable or awarded as a matter of absolute legal right but is directed to and governed by the sound legal discretion of the court, dependent upon the facts and circumstances of each particular case. It will not be granted where enforcement would be unjust, * * *." Johnson v. Norton, 152 Neb. 714, 42 N. W. 2d 622.

John Neuhaus, paternal grandparent of Johnnie, acquired this land in 1903. He died testate on August 3, 1924, still possessed thereof. During this time neither he nor his wife Edith ever occupied the premises. By

his will, which was duly admitted and allowed to probate by the county court of Douglas County on September 30, 1924, he disposed of his interest in this land by the following provisions thereof:

"Second, I give devise and bequeath to my beloved wife, Edith Neuhaus, a life Interest in all of my real Estate, she to have the income from same as herein provided, she also to pay the Real Estate taxes on same. * * *

"Fourth, I give devise and bequeath to my son Gustav Neuhaus the North East quarter (N. E. ¼) of Sec. 7 Township 15 Range 12 Douglas County Nebraska, subject however to the Life Interest of Edith Neuhaus as provided in section two or second section of this instrument, and also on the condition that he shall at my death pay to my wife Edith Neuhaus two thousand Dollars ($2,000.00). Cash, and Eight hundred Dollars ($800.00) each year to Edith Neuhaus during her natural life, I also give devise and bequeath to my son Gustav Neuhaus the South half (S½) of N. W. ¼ of N. W. ¼ of Sec. 8 Twp 15 Range 12 Douglas County Nebraska, subject however to the Life Interest of Edith Neuhaus as provided in second section of this instrument and also the conditional payment as provided in this section four, (Fourth)."

It will be noted that the testator did not give his wife, Edith Neuhaus, a life estate in this property but a "life interest" therein. The extent of the income of this life interest is, as stated in the second paragraph, provided in the will. It is fixed by the fourth paragraph at $800 a year during Edith's life and makes the land subject thereto. This amount is to be paid by his son Gustav, the devisee of this land. The provisions of the second paragraph charge her with the payment of the real estate taxes on this land. These provisions have been thus understood and applied by the parties during all of the years since John Neuhaus' death. Edith

Neuhaus was still living at the time of the trial and was then 80 years of age.

By his will we find John Neuhaus devised to his son, Gustav Neuhaus, the lands herein involved subject to a charge of $2,000 in favor of his wife Edith, which Gustav has paid, and subject to an annual payment of $800 to Edith, which has been paid to her each year up to and including the year 1951. Out of this sum she is required to and has paid the real estate taxes assessed against this land. The will created no possessory rights in Edith, nor has she ever asserted any. It provides for an annual payment to her which payment is a charge on this land as long as she lives.

Gustav and Anna were married on April 25, 1917. Johnnie, their son, was born on May 13, 1918. They moved onto the northeast quarter of Section 7 about March 1, 1920, and lived thereon continuously up until the death of Gustav on July 7, 1946. Gustav died intestate and his estate has been administered by the county court of Douglas County. He left surviving as his sole heirs at law his widow, Anna, and his son, Johnnie.

Any interest in real estate, either legal or equitable, that gives a present right of occupancy or possession, followed by exclusive occupancy, is sufficient to support a homestead right therein. See, Giles v. Miller, 36 Neb. 346, 54 N. W. 551, 38 Am. S. R. 730; Fisher v. Kellogg, 128 Neb. 248, 258 N. W. 404.

"Actual occupancy of lands or town lots, within the limits defined by statute, by a husband and wife at the time of the death of the fee-holding spouse will, in the absence of clear and satisfactory evidence to the contrary, be deemed a selection of the same from the separate property of the decedent spouse as the homestead of the husband and wife." Shearon v. Goff, 95 Neb. 417, 145 N. W. 855.

Under the provisions of section 40-117, R. R. S. 1943, such homestead, upon the death of the fee-holding

spouse, vests instantly in the surviving spouse for life. See, Shearon v. Goff, *supra*.

" 'Immediately upon the death of the husband, the unincumbered homestead vested in his widow and could not be taken into account in the administration of his estate. In re Hadsell, 82 Neb. 587.' Dillon v. Dillon, 103 Neb. 322, 171 N. W. 917. See, also, Bartels v. Seefus, 132 Neb. 841, 273 N. W. 485; Hobson v. Huxtable, on rehearing, 79 Neb. 340, 116 N. W. 278." Horn v. Gates, 155 Neb. 667, 53 N. W. 2d 84.

" 'Under our statute, when the holder of the legal title of the homestead dies, the law creates new estates, a life estate in his widow and an estate in remainder in his children and heirs. It is immaterial whether the widow and children continue to occupy the premises. Their estates do not depend upon the occupancy thereof after the death of the holder of the legal title, but vest in them absolutely on his death.' Naiman v. Bohlmeyer, 97 Neb. 551, 150 N. W. 829." Horn v. Gates, *supra*. See, also, Shearon v. Goff, *supra*.

We find Anna has a life estate in the northeast quarter of Section 7 of the lands herein involved.

Johnnie, who had been in the service, returned about December 26, 1945. In April 1946, he made arrangements with his father, Gustav, to farm this land for him on a 50-50 crop share basis. He was then married and he and his wife, Leona, moved out on the farm with his parents. His father died shortly thereafter. Johnnie then made financial arrangements with a bank at Millard, Nebraska, and purchased the machinery belonging to his father. He bought it from the representatives of the estate. Johnnie continued farming the place during the years of 1947, 1948, 1949, and 1950, under an oral arrangement with Anna, his mother. For some reason, not too clearly shown in the record, Johnnie did not make a financial success of farming. Sometime in July 1950, his wife left him and thereafter, on August 3, 1950, sued him for a divorce. Johnnie also left the

farm sometime in 1950, just when is not too clearly shown but apparently it was about when his wife left him. He thereafter lived in Omaha. After going to Omaha he first worked for the Peoples Ice Company and later for the Omaha Grain Exchange. While he did some of the farm work in 1950 and hired help to do the rest, he did, however, let the farm run down.

Anna had received very little rent during the years following her husband's death. Johnnie's farming difficulties came to a head when, in November 1950, Anna brought an injunction suit for the purpose of requiring the proceeds of the 1950 crop to be properly applied. The finish of Johnnie's farming operations came when, on May 8, 1951, the bank at Millard foreclosed the chattel mortgage it had on his farming equipment by selling it at a public sale. After the proceeds from the sale of the 1950 crops and these chattels had been applied, Johnnie was still owing these creditors and to secure the balance of his debts to them he gave mortgages on his interest in this land. In other words, as a result of his farming operations for the years of 1946 to 1950, inclusive, Johnnie ended up in financial difficulties.

Without going into too much detail in regard thereto, the testimony of Johnnie is to the effect that early in January 1951, Anna, who was then living in the house on this farm, told him she thought they should sell the farm as she was too old to live out there all alone and for him to find out if they could sell their interests and leave the grandmother's interest therein; that he did so and found out they could; that he informed her of this fact and that he had an offer of $215 an acre; that this would be net as there was to be no commission for selling it; that she said that price was all right; that his attorney then prepared the contract; that on February 1, 1951, he took the contract to the farm where she read and then signed it; that she did so of her own accord; that thereafter he signed it and then delivered

it to Boyle, who was agent for Corrigan; that on February 2, 1951, he delivered to Anna a check for $25, payable to her, as her half of the down payment; that they had discussed the division of the purchase price on a 50-50 basis; that they discussed obtaining an abstract for the property and that he did so; and that Anna made no protest to selling the property until about March 1, 1951, when she was asked to sign a deed thereto. Suffice to say, based solely on appellants' proof, especially the testimony of Johnnie, it could be found Anna freely and voluntarily entered into the agreement.

Anna testified that at the time of the trial she was 56 years of age; that she had a seventh grade education; that she could read and write; that she had very little business experience, especially in dealing in real estate; that Johnnie had left the farm home and it was unoccupied; that about December 26, 1950, she went back out there to live; that commencing in the forepart of January 1951, Johnnie started coming out to the farm to see her; that he came three or four times a week; that he told her he was boss of the farm and that she had no business there; that he was going to put her off; that he told her this every time he came out; that Johnnie was hard up financially; that he told her he wanted to sell the farm because of his financial condition; that she told him she did not want to sell; that he told her he was going to sell his interest in the farm and whoever bought it could move in with her as they would have equal rights; that he told her that grandma was going to raise her annual charge from $800 to $2,000 and if she could not pay that amount by March 1 she would only get $50; that all of these threats made her nervous; that because thereof she could not eat or sleep properly; that he came out on February 1, 1951, with the contract; that she was then in a highly nervous condition and felt sick; that she told him she did not want to sell; and that she signed the contract against her wishes because of this series of threats. It

would serve no useful purpose to set out any more of her testimony in detail because, if her testimony is to be believed, the contract was unfair, unjust, and certainly not her voluntary act and deed.

In this situation the following has particular application: " '* * * when the evidence on material questions of fact is in irreconcilable conflict this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the opposite.' O'Brien v. Fricke, 148 Neb. 369, 27 N. W. 2d 403." Sopcich v. Tangeman, *supra*.

There is another bit of evidence that we call attention to and that is the fact that before the contract was filed for record a false acknowledgement was placed thereon by a notary. Anna never did acknowledge the contract as her voluntary act and deed before the notary whose seal and signature appears thereon. That fact was admitted by the notary.

As to the contention that Mainelli is not bound by what Johnnie said to Anna, we think what was said in Moore v. McKillip, 110 Neb. 575, 194 N. W. 465, where there was a comparable situation, is here applicable. Therein we said: " 'However strong, clear and emphatic the language of the contract, however plain the right at law; if a specific performance would, for any reason, cause a result, ·harsh, inequitable or contrary to good conscience, the court should refuse such a decree and leave the parties to the remedies at law. * * *.' Kelley v. York Cliffs Improvement Co., supra."

We think there are many reasons why this contract should not be enforced because it would be unfair to Anna to do so. Among these is the fact that it has been her home for more than 33 years; that Johnnie's basis for division of the proceeds is not in accordance with their respective interests; and primarily because of the circumstances under which it was obtained, that

is, by threats and intimidations let alone her apparent misunderstanding of her rights therein. We find the whole scheme of things indicates a planned arrangement whereby Johnnie, who is one of, if not the sole, real party in interest, attempted to overreach Anna by unfair tactics. Such being true we can come to no other conclusion than that of the trial court. We therefore affirm its action.

AFFIRMED.