Note—See Trusts, 26 R. C. L. 1315.

---

NELSON S. MERCER ET AL., APPELLEES, V. PAYNE & SONS COMPANY, APPELLANTS.

FILED APRIL 12, 1927. No. 24475.

1. **Specific Performance.** A court of equity will not enforce a contract, unless it is complete and certain in all its essential elements. The parties themselves must agree upon the material and necessary details of the bargain, and if any of these be omitted, or left obscure or indefinite, so as to leave the intention of the parties uncertain respecting the substantial terms, the case is not one for specific performance. It is not the function of a court of equity to make a contract for the parties, or to supply any of the material stipulations thereof. If any of the essential details are wanting, a chancellor will not supply them in a decree for specific performance. *Zimmerman v. Rhoads*, 226 Pa. St. 174.

2. ———. Specific performance of a contract will not be decreed, unless the contract has actually been concluded; or, if any material part of it still rests in treaty, and remains to be settled by further negotiation, equity will not interfere. *Domestic Telegraph & Telephone Co. v. Metropolitan Telephone & Telegraph Co.*, 39 N. J. Eq. 160.

3. ———. To entitle a party to specific performance, there must be a clear, mutual understanding and a positive assent on the part of each party. *Creecy v. Grief*, 108 Va. 320.

4. ———. Mutuality of obligation is an essential element of the right to enforce specific performance of a contract in a court of equity. *Childs v. Reed*, 34 Idaho, 450.

5. ———. Where a contract is informal and not sufficiently definite in its terms to be susceptible of specific performance, and the contract further provides that a formal lease shall thereafter be drawn, and the parties, after repeated efforts, fail to agree on the terms of the formal lease, specific performance is properly denied. *Raccoon Coal Co. v. Faulkner*, 168 Ky. 235.

6. Contracts. It is elementary that, if the minds of the parties do not meet in the making of a proposed contract, and if they cannot themselves agree upon its terms, the courts are, of course, powerless to make a contract for them.

7. ———: TIME. In the absence of a provision in a contract making time for completion one of its essential terms, such contract is, nevertheless, to be completed within a reasonable time.

APPEAL from the district court for Douglas county: CHARLES A. GOSS, JUDGE. *Reversed, with directions.*

*William Baird & Sons,* for appellants.

*John P. Breen* and *William H. Herdman, contra.*

Heard before ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

DEAN, J.

This is the second appearance of this suit in this court. In the former opinion it is pointed out that the suit had its origin in a written instrument, which is referred to as a "preliminary agreement" for a more formal contract to be thereafter made between the parties. The preliminary agreement, as construed by the parties, contemplated future negotiations for the making of a formal 99-year leasing contract between plaintiffs, as lessors, and defendants as lessees, for three improved building lots in Omaha, lo-

cated at the northwest corner of Farnam and Twenty-seventh streets. The lots are owned by plaintiffs. At the first trial the district court sustained a demurrer to the petition on the ground that the contract is indefinite and uncertain in its terms. Thereupon plaintiffs appealed, the judgment was reversed and the cause was remanded regularly for trial. *Mercer v. Payne & Carnaby Co.*, 110 Neb. 28. Subsequently, new pleadings having been filed by the parties, the case was tried on the merits, and the district court rendered a judgment in favor of plaintiffs, from which the defendants have appealed. The law of the case rule prevails in this state. It follows that, under the rule, the former judgment constitutes the law of the case, so far as it is applicable to the facts and the amended pleadings and the record now before us. *Hayden v. Frederickson*, 59 Neb. 141.

It is proper here to observe that, owing to certain changes in personnel, the defendants now consist solely of the Payne & Sons Company and, except as herein otherwise designated, the company will be referred to as the defendants.

The above mentioned "preliminary agreement" which contemplated the future negotiations between the parties, as above noted, is in words and figures following:

"Omaha, Nebraska, February 11, 1920.

"Received of Payne & Slater Company twenty-five hundred dollars ($2,500) as earnest money on the following proposition:

"Payne & Slater Company agree to enter into a ninety-nine year (99) lease on lots six (6) seven (7) and eight (8) block six (6), Boggs & Hill's First addition and to pay the sum of fifteen thousand dollars ($15,000) cash, of which the above twenty-five hundred dollars ($2,500) is a part, and to pay as rent the sum of six thousand dollars ($6,000) net per year for the first ten years of the lease, the sum of sixty-nine hundred dollars ($6,900) net per year for the second ten years of the lease, and the sum of eight thousand dollars ($8,000) net per year for the

last seventy-nine years of the lease; all payments to be made quarterly in advance.

"Complete abstract to be furnished, showing good title, and the property leased free and clear of all taxes, except the taxes for the year 1920, and subject to the existing lease now on the property. Insurance now on the property to be paid for *pro rata.*

"The lease to contain the usual conditions of a ninety-nine year (99) lease and to contain an option to purchase said property during the year 1930 for the sum of one hundred fifteen thousand dollars ($115,000) in addition to the above on payment of thirty-five thousand dollars ($35,000) or more in cash, thirty-five thousand dollars ($35,000) on or before three years from date of purchase and forty-five thousand dollars ($45,000) on or before five. years from date of purchase. The said lease to contain a further option to purchase said property during the second ten years of the lease for the sum of one hundred thirty thousand dollars ($130,000) on payment of one-third cash and one-third on or before three years and one-third on or before five years from date of purchase. All deferred payments on both options to bear interest at the rate of 6 per cent. payable semi-annually. Said lease to contain an agreement that a building costing at least fifty thousand dollars ($50,000) be erected on said property on or before ten years from date of lease.

"Lease to be completed and signed and balance of fifteen thousand dollars ($15,000) paid on or before sixty days from date thereof.

"It is understood that all necessary insurance clauses and provisions for bond when the present buildings are torn down before the new building is constructed, and other necessary provisions for the protection of the owner to be included in the lease.

"Harry A. Tukey.

"Payne & Slater Company hereby agree to enter into the above lease and to fulfil conditions of the above receipt.

"Payne & Slater Company, by E. M. Slater.

"I hereby authorize Harry A. Tukey to sign said lease, the form of the lease to be approved by me.

"N. S. Mercer."

Did the negotiations between the parties bring about a meeting of the minds in respect of the subject-matter here involved so as lawfully to compel the defendants to execute a 99-year lease as lessees of the plaintiffs, as they contend? That there was such a meeting of the minds and that defendants are therefore bound to execute such lease is the contention of the plaintiffs.

On the contrary, the defendants contend that the weight of the evidence, fairly considered, shows that the minds of the parties never met in respect of the material terms of a 99-year leasing contract, and that there is now, and always has been, such a lack of mutuality of agreement between them, in respect of the subject-matter, that a contract never could at any time have been consummated, and never was consummated, between the parties, and that mainly for these, and other reasons hereinafter noted, no obligation ever at any time rested on defendants to execute a 99-year lease as contended by plaintiffs.

The "preliminary agreement" for the execution of a 99-year lease expressly provides that the lease is "to be completed and signed * * * on or before sixty days from date thereof." Incidentally, it may be added that the parties construe the word "thereof" to mean "hereof" as it plainly, and for obvious reasons, can refer only to the preliminary agreement. And it is in accord with the usual custom that the moving party, in point of time, is ordinarily charged with the duty of tendering a duly signed conveyance to the grantee. We do not think the signing of the preliminary agreement excuses plaintiffs from complying with the 60-day period, for signing the lease, which expired on or about April 15, 1920. The fact is that the grantors never signed or tendered a signed lease at any time before or at the trial, nor does the decree so require.

Section 2451, Comp. St. 1922, provides: "No estate or

interest in land, other than leases for a term of one year from the making thereof, nor any trust or power over or concerning land, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered, or declared, unless by operation of law, or by deed of conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same."

In *Irish v. Pulliam*, 32 Neb. 24, it was held that a certain agreement, which had to do with a building contract, "was to be reduced to writing and signed by the parties before it took effect." It was there held that until it was signed the contract was not complete. It has been held that such signing is imperative. 24 Cyc. 958; *Mather v. Scoles*, 35 Ind. 1. *Soper v. Gabe*, 55 Kan. 646, holds that the rule applies to contracts for "the sale and conveyance of land." To the same effect is *Counce v. Studley*, 81 Me. 431; *Howe v. Huntington*, 15 Me. 350. Where the execution of a deed is involved, an offer "of readiness at all times to make it will not do." *Klyce v. Broyles*, 37 Miss. 524; *Lanyon v. Chesney*, 186 Mo. 540.

In respect of their contractual duties, the conduct of plaintiffs was so dilatory that it practically amounted to an abandonment of the negotiations "for a contract." That they did not exercise even ordinary diligence is in very large part established by their own evidence. Their first substantial move was not undertaken until about a week after defendants' served a written demand on them for, first, a return of the $2,500 earnest money, and, second, a notice that they, the defendants, had "withdrawn from any further negotiations." The lack of diligence by plaintiffs is disclosed, in part, in the following facts: Dr. Mercer left for Europe March 30, 1920, and did not return to Omaha until September 7, 1920. This was almost five months after the prescribed date for the execution of the 99-year lease. Harry A. Tukey, an Omaha real estate dealer of 23 years' experience and, according to his own evidence, an associate party plaintiff, was in California from about the first of August, 1920, and did not return

to Omaha until about five months after the required date
for signing, though authorized to sign for Mercer. It
also appears that, under plaintiffs' theory of the case, Dr.
Mercer's wife was a necessary signatory party, and she
was therefore caused by plaintiffs to sign and ac-
knowledge a power of attorney wherein her husband was
authorized to sign the proposed 99-year lease in her behalf.
This power of attorney was executed, and acknowledged
by Mrs. Mercer in Surrey county, England, but not until
October 9, 1920, which was almost six months after the re-
quired 60-day period and almost eight months after the
date of the preliminary agreement for the execution of a
formal contract for a 99-year lease. And in June, 1920,
while Dr. Mercer was yet in London, Tukey sent a letter
to him from Omaha, under date of June 11, 1920. One
page of this letter is in evidence and is here reproduced:

"June 11, 1920.

"Dr. N. S. Mercer,
"63 Philbeach Gardens,
"London, S. W.:—

"Have been waiting for two or three weeks for Harry
Reed to make a search of the records of the lease concern-
ing 'gold clauses.' Yesterday he reported to me and showed
about twenty leases with 'gold clauses' and a little more
than that without 'gold clauses.' I had an agreement with
Slater that if we could show up the majority of leases as
having 'gold clauses' they would sign the 'gold clause.' He
seems to want to be very fair about the matter but we have
not succeeded in accomplishing what we tried to do. Of
course, Slater is not taking the arbitrary stand that he re-
fuses to sign the 'gold clause' but stated to me yesterday
that he feels that there is some claim on his side of the
question. Frankly, I think the matter better rest until your
return in September, as I am afraid it is almost impossible
to draw up leases with the parties so far apart. There are
so many little details of all kinds to settle. If this is sat-
isfactory to you, I think I can arrange it with Slater. Kind-
ly let me hear from you regarding this."

A letter of this tenor, written so long after the lease was "to be completed and signed," appears fairly to disclose that the minds of the parties were always widely separated in respect of material propositions relating to the project. Clearly the facts warranted Tukey in this observation in the above letter to his coworker Mercer: "I am afraid it is almost impossible to draw up leases with the parties so far apart." The letter, however, speaks for itself, and the state of facts reflected by this letter seems to have prevailed throughout the entire series of negotiations. This state of affairs became so very apparent that, on November 22, 1920, which was then almost ten months after the preliminary agreement was signed, the defendants sent the written demand, above referred to, for a return of the $2,500 earnest money, and therein advised plaintiffs that they had "withdrawn from any further negotiations." The written demand and notice are incorporated in the same instrument in language following:

"Nov. 22, 1920.

"Mr. Harry A. Tukey,
"Omaha, Nebraska.
"Dear Sir: Payne & Carnaby Company (formerly Payne & Slater Company) hereby requests the return by you of the $2,500 placed with you as earnest money as set forth in a receipt signed by you under date of February 11, 1920, said receipt relating to negotiations for a ninety-nine year lease to be entered into by Payne & Slater Company as lessee covering lots 6, 7, and 8, in block 6, in Boggs & Hill's First addition to the City of Omaha, Douglas county, Nebraska.

"This will also serve as notice to you that the undersigned have withdrawn from any further negotiations in reference to the matter above mentioned. Yours respectfully,

(Signed)    "Payne & Carnaby Company,
                    "By H. B. Payne, Pres."

In respect of the foregoing notice Mr. Tukey testified: "Q. Now, did you ever, at any time, receive from the de-

fendant, or any one representing the defendant, any demand for the return of the $2,500 earnest money, other than the demand that is made in that letter? A. Not previous to that time. Q. Were you ever notified by the defendants or any one representing the defendants that they would not go ahead and complete this deal except as you were notified by this letter and prior to the date of this letter? A. Well, in the negotiations it might have been stated at different times that they wouldn't sign the lease the way we had it, or something of that kind, but never that they wouldn't sign any lease."

The statement by Mr. Tukey that defendants never said· they would not sign any lease corroborates other of the evidence which goes to show that the defendants acted in entire good faith, but they had reasonable cause to despair of the ability of the parties to agree upon the terms of the proposed leasing contract. Incidentally, it may be noted that, in respect of the earnest money paid over by defendants to plaintiffs, Mr. Tukey testified: "Q. That $2,500 original payment which was made at this time, what was done with that? A. Gave Doctor Mercer $1,250 of it, and I still hold $1,250 of it." This evidence tends to support Tukey's former statement that he is one of the parties plaintiff and also the defendants' observation that Tukey did not return the earnest money because he had only half of it and Mercer had the other half.

The sending of the above letter of the defendants to the plaintiffs, under date of November 22, 1920, was followed five days afterward by a visit of Tukey and Mercer to the ·office of Mr. Slater, then one of the defendants. This was almost ten months after the date of the preliminary agreement and about eight months after it was agreed that the 99-year lease should be signed. On the occasion of this call at Slater's office, Mercer testified that he informed Slater that he had Mrs. Mercer's "power of attorney" with him, and that the plaintiffs "were prepared to sign up, or something; I don't remember the exact words," and Mercer further testified that he thought Slater then said "he

Mercer v. Payne & Sons Co.

wouldn't sign at that time; that is the substance I believe, practically, that is about all." In view of the evidence pointed out herein, it will not, of course, be seriously contended that defendants, or any of them, were chargeable for the plaintiffs' lack of reasonable diligence in the premises. Nor is it surprisingly strange that Slater, or any other party defendant, would say that "he wouldn't sign at that time." Slater was then only one of the parties defendant, and, in view of the evidence, who can doubt that he was justified in what he said to plaintiff Mercer. True, the contract does not specifically proclaim that "time is of the essence of the contract." Nevertheless, all contracts are to be construed in the light of a reasonable compliance with such business usage, and promptness in performance, as may reasonably bear relation to the facts in the individual case. Did the plaintiffs reasonably comply with their duty in respect of the exercise of reasonable diligence in the premises? We do not think so.

Plaintiffs attached a copy of a proposed lease to their amended petition, as exhibit A, which consists of 25 pages of legal cap. · And at the trial they offered the following additional instruments in evidence, namely, an instrument denominated "an original draft of lease," as exhibit 2, consisting of 22 pages of legal cap, and exhibit 3, which is denominated "second draft of lease," and which consists of 19 pages of legal cap, and also exhibit 6, which is denominated "another form of lease," and which consists of 23 pages of legal cap. All of the above exhibits are in evidence. What means this avalanche of legal documents that fell from plaintiffs' pen? They consist of almost 100 pages of typewritten legal cap. That the multitude of leases only added to the confusion of everybody who had to do with the entanglements of this controversy is perfectly apparent from an inspection of the record. Small wonder that from its midst the defendants, after a fruitless parley that lasted almost a year, finally sought relief by withdrawing "from any further negotiations."

To the suggestion, if it should be made, that if the de-

Mercer v. Payne & Sons Co.

fendants were dissatisfied with the contracts in evidence they should have submitted a contract that was to their liking, the answer is that they submitted no contract nor could they be compelled to do so. They complied with the provision for "negotiating" under the terms of the preliminary agreement. Are the defendants to be penalized because they refuse to execute one of the several confusing 99-year leases so submitted by the plaintiffs? It is elementary that, if the minds of the parties do not meet in the making of a proposed contract, and if they cannot themselves agree upon its terms, the courts are, of course, powerless to make a contract for them. A form of 99-year lease is incorporated in the final decree, and this decree, to which the name of the presiding judge is affixed, consists of 19 pages, and it is repeatedly referred to by counsel as "the court's lease." But it was doubtless prepared by the clerk, or perhaps by counsel, for it is a custom, well-established and almost universally recognized in this jurisdiction, and of which we take judicial notice, that, in the more important civil cases, counsel ordinarily prepare the court's decrees. But this custom, of course, can have no bearing whatever in the premises. From the judgment the defendants alone have appealed.

The material provisions which are contemplated by the preliminary agreement in suit may, of course, be incorporated in a 99-year lease of real estate, but only as and when such provisions are expressly agreed upon between the parties and where there has been a complete meeting of minds in respect thereto. The former opinion almost in its opening sentence has this to say: "There is nothing presented by the appeal except the sufficiency of the petition to state a cause of action for specific performance." And in plaintiffs' brief it is pointed out that, subsequent to the above ruling, when the suit was remanded they filed an amended petition, to which the defendants filed an answer, and to this plaintiffs filed a reply, and that the suit thereupon regularly proceeded to trial and the rendition of a "final decree," under the amended pleadings.

.This final decree, among others, contains this recital: "(4) Finds that plaintiffs are entitled to have said defendants, Payne & Sons Company, specifically perform said contract of February 11, 1920 (the preliminary agreement), by executing, as lessee, in duplicate a lease in words and figures following, to wit." The foregoing recital in the decree is followed by a form of a 99-year leasing contract, and in this form of lease the court prescribes the terms and conditions of a contract which has to do with the leasing of a tract of highly valuable real estate in a thickly settled business location of a rapidly expanding, midwestern, metropolitan city. And near the close of the decree the court continuing "(5) finds that a lease in the form set forth in the preceding (court's) finding contains not only the terms and conditions agreed upon specifically in said contract of date February 11, 1920 (the preliminary agreement), and also contains such covenants as are implied by law and such conditions as are 'the usual conditions of a ninety-nine (99) year lease' as shown by the evidence. * * * It is therefore ordered, adjudged and decreed by the court: (1) That the defendant, Payne & Sons Company, shall, within sixty days after there is tendered to them in duplicate a lease in the form and words and figures set forth in finding No. 4 of this decree and duly signed by the plaintiffs Nelson S. Mercer and Anna M. Mercer and acknowledged by said plaintiffs in such form as to entitle the same to be recorded under the laws of the state of Nebraska, sign, make, execute and deliver, as lessee, said lease so tendered in duplicate and acknowledge the same in such form as to entitle the same to be recorded under the laws of the state of Nebraska, and on the execution of the lease as aforesaid, one of the duplicates thereof shall be delivered to said defendant, Payne & Sons Company, and the other retained by said plaintiff Nelson S. Mercer; and it is further ordered, adjudged and decreed that upon the failure of the said defendant, Payne & Sons Company, to sign, acknowledge, make, execute and deliver said lease as aforesaid,

then and in such case the clerk of this court, as special master, shall sign, acknowledge, make, execute and deliver said lease for and in behalf of said defendant, Payne & Sons Company, and when so executed the said lease shall have like effect as if signed, acknowledged, made, executed and delivered by said defendant, Payne & Sons Company, by its proper and duly authorized officers. * * * To all of which the defendant Payne & Sons Company excepts and is allowed forty (40) days from the rising of the court to prepare and serve its bill of exceptions herein. On motion of defendant supersedeas bond herein is fixed at the sum of ten thousand ($10,000,) dollars."

Defendants contend that the court's lease "differed in its conditions and requirements from both the first and second drafts" of the proposed leases submitted by plaintiffs. Following are some of the noticeable differences to which defendants take exception, as pointed out in their brief, their argument being that the court's lease herein eliminates the requirement with reference to payments being made in gold coin and calls for only 7 per cent. interest on defaulted payments instead of 10 per cent., and it eliminates the requirements in regard to furnishing tax receipts and furnishing bond in case of contest on taxes, and changes the requirements in regard to insurance, and eliminates the requirements as to wind and lightning insurance, and it changes the requirements in regard to keeping the premises in repair, and also changes the terms pertaining to restoration of improvements, and eliminates requirements as to boiler, elevator or liability insurance, and changes the conditions pertaining to alteration or remodeling and new buildings, and also changes the requirements in regard to the use of the premises, and in respect of the lessee indemnifying the lessor against liens and charges, and it changes the requirements in regard to the notice being given in case of any default, and it also omits any condition with reference to any defect in the lessor's title. In appellees' brief no objections are noted, under supreme court rule 12 (94 Neb. p. XI), to the above exceptions taken by the appellants.

The vitally decisive point, however, is that the decree herein enforces specific performance of a lease that was not submitted by either party and upon which the minds of the parties did not meet.

While this suit is one of first impression here, we are not without accepted authority from other jurisdictions. *Goldstine v. Tolman,* 157 Wis. 141, involves a suit which was begun by plaintiff for specific performance of an alleged agreement to enter into a 99-year lease for certain property in Milwaukee. Plaintiff prevailed in the trial court, and on appeal the judgment was reversed. The case appears to be in point here. In that case, as here, the parties executed a preliminary agreement. Goldstine was plaintiff and Tolman was defendant. The trial court held that the form of the lease submitted by plaintiff in some respects appeared to fulfil the requirements of the preliminary agreement. But the court was not altogether satisfied and drew up a lease which, in the court's opinion, practically conformed to the terms mentioned in the preliminary agreement and therein granted the relief prayed for by plaintiff. On appeal to the supreme court the judgment of the trial court was reversed on the ground that the minds of the parties had not met and for the additional reason that the lease was written by the court.

The rule appears to be, as deduced from the authorities, that a court of equity will not enforce a contract, unless it is complete and certain in all its essential elements, and the parties themselves must agree upon the material and necessary details of the bargain, and if any of these be omitted, or left obscure or indefinite, so as to leave the intention of the parties uncertain respecting the substantial terms, the case is not one for specific performance. It is not the function of a court of equity to make a contract for the parties, or to supply any of the material stipulations thereof. If any of the essential details are wanting a chancellor will not supply them in a decree for specific performance. *Zimmerman v. Rhoads,* 226 Pa. St. 174.

Specific performance of a contract will not be decreed,

unless the contract has actually been concluded; or, if any material part of it still rests in treaty, and remains to be settled by further negotiation, equity will not interfere. No court has power to make a contract for persons *sui juris*, nor to compel them to agree with each other. *Domestic Telegraph & Telephone Co. v. Metropolitan Telephone & Telegraph Co.*, 39 N. J. Eq. 160. To entitle a party to specific performance, there must be a clear, mutual understanding and a positive assent on the part of each party. *Creecy v. Grief*, 108 Va. 320. Where a contract is informal and not sufficiently definite in its terms to be susceptible of specific performance, and the contract further provides that a formal lease shall thereafter be drawn, and the parties after repeated efforts fail to agree on the terms of the formal lease, specific performance is properly denied. *Raccoon Coal Co. v. Faulkner*, 168 Ky. 235. A court of equity will decree specific performance of a contract only where, in the exercise of sound legal discretion, it finds, from all the circumstances, the specific performance will subserve the ends of justice. It is never decreed as a matter of course, even when a legal contract is shown to exist. *McDonald v. Minnick*, 147 Ill. 651. Mutuality of obligation is an essential element of the right to enforce specific performance of a contract in a court of equity. *Childs v. Reed*, 34 Idaho, 450.

Finally, if brief repetition may be indulged, Tukey's observation may be noted in respect of the good faith of defendants, in that he said they might have stated, at different times that "they wouldn't sign the lease the way we had it, * * * but never that they wouldn't sign any lease." Did a party litigant anywhere ever receive a better certificate of good faith from his adversary?

The judgment against defendants is reversed, and the cause is remanded to the district court, with directions to enter a judgment in favor of defendants, and against the plaintiffs, for $2,500 paid to plaintiffs by defendants, together with interest thereon at 7 per cent. per annum, from November 22, 1920, to the date of the entry of the

judgment in the district court, and to dismiss plaintiffs' cause of action.

REVERSED.

ROSE, J., dissenting.

In my opinion defendant entered into an enforceable contract to lease from plaintiffs three building lots in Omaha for 99 years. Defendant made at the time a cash payment of $2,500. The parties entered into their own contract. It contained in specific written terms the vital elements of a 99-year lease. The lots were described. The period of tenancy was 99 years. The annual net rental for the first period of 10 years was fixed at $6,000; for the second period of 10 years, $6,900; for the third period of 79 years, $8,000. Defendant had an option to purchase the lots. It was agreed that the lease should contain the usual conditions of a 99-year lease. It was distinctly held on the former appeal: "Sufficient evidence of 'usual conditions' of a 99-year lease, to which the parties agreed, will, in that particular, leave nothing open for negotiation." Upon a trial of the merits, after the cause was remanded, the district court, in my view of the record, properly decreed the mutual terms on which the minds of the parties met when they entered into the contract prior to the drop in rental values.