## DIAL TOASTER CORPORATION v. WATERS-GENTER COMPANY AND ANOTHER.[1]

No. 27,611.

August 29, 1930.

*Kingman, Cross, Morley & Cant* and *C. J. Rockwood,* for appellant.

*James E. O'Brien* and *Edward S. Bade,* for respondent.

[1]Reported in 233 N. W. 870.

STONE, J.

After adverse findings and order for judgment its motion for a new trial was denied, and plaintiff appeals.

The action arises from a "patent pooling" contract of March 19, 1927. The patents involved covered automatic electric bread toasters and improvements thereto. One, known as the Rogers patent, was owned by plaintiff. Others, the "Strite patents," were owned by defendant Waters-Genter Company, hereinafter referred to as though it were the sole defendant. Its codefendant, Walter E. Johnson, can be more conveniently designated by his surname only. He was the third party to the contract for a purpose soon to be stated.

After reciting their ownership of the patents, the desire of plaintiff and defendant "to pool their rights to manufacture" under all of them and to have Johnson "handle the licensing of others," the contract assigned from plaintiff to defendant the Rogers patent and trademark rights. Next, defendant employed Johnson "as its royalty sales manager * * * to take complete charge of the licensing of others to manufacture and sell * * * in exclusive charge of negotiating and executing such license contracts."

By the agreement, but subject to its own approval, defendant authorized Johnson to enter into licensing contracts on its behalf "on the best royalty basis obtainable" in each instance. Defendant was prohibited from entering into any such contracts "except through Johnson and as herein specified." It was provided that "in the event that no licensing agreement" should be entered into by Johnson before March 1, 1928, "then this agreement shall be cancelled and the parties shall, as nearly as possible, restore each other to their status prior to the execution of this agreement." There are numerous other terms not now material. The thing presently decisive is that neither the form nor substance of the proposed licenses was agreed upon and none could be entered into without, on the one hand, the approval of defendant, and on the other the procurement and consent of Johnson, who was plaintiff's representative. In that fashion plaintiff and defendant each reserved the right of

veto as against any licensing contract proposed or wanted by the other.

It may be assumed that Johnson endeavored with diligence to negotiate licensing agreements. He procured from a responsible corporation, which we shall call the Fitzgerald Company, the tender of one. But defendant refused its approval, and the proposed licensing contract was not made. There has been no other. So by its own terms the "patent pooling agreement" lapsed March 1, 1928, unless defendant was under an enforceable contractual obligation to approve the Fitzgerald contract as tendered. The principal relief wanted by plaintiff is a decree compelling defendant to approve of and bind itself by that contract. It may be assumed that if such a decree were properly obtainable it could be made effective nunc pro tunc so as to give plaintiff the benefit of the Fitzgerald offer as of a date prior to March 1, 1928, and thereby the lapse of the basic contract be prevented.

There is nothing about the subject matter of the main contract which puts it beyond the power of equity to compel specific performance. The difficulty is that were a judge to order what plaintiff asks he would be making a contract for the parties rather than enforcing one already made by themselves.

The contract required, in respect to licensing agreements to be procured thereunder, only that they should be "on the best royalty basis obtainable in each instance." Plaintiff asserts that anything from 25 to 35 cents a toaster would be a reasonable royalty. Defendant put the figure much higher. The contract fixed no royalties and is equally silent as to terms involving other matters. Like a lease or contract for the sale of real estate, a patent licensing agreement may be very simple or very involved.

Some of the questions to be settled are these: Is the license to be assignable or not? Are the royalties to be "flat" or on a percentage basis? Is there to be one rate for one class of articles and another rate for another? If on a percentage basis, what, if any, trade discounts are to be deducted in determining the basis for computation of royalties? What shall be the terms of reporting,

accounting and payment? What right is licensor to have to examine and audit the books and other records of licensee in order to verify its reports of royalties? How are the articles to be trademarked and advertised? What provision is to be made against infringement and concerning possible suits for infringement against licensor or licensee and the result of such litigation, favorable or unfavorable? How and for what default is the contract to be subject to cancelation? What, if anything, shall be included in the way of a price maintenance agreement, and how shall it be enforced? Shall a minimum production, or of sales and/or royalties be granted? If so, how much?

A form of licensing agreement, found in a recent work on patents, after the conventional recitals, proceeds in great detail with no less than 17 numbered subdivisions. 2 Walker, Patents (6 ed.) 1437. In any one of them can be found material for disagreement of such nature as easily to be an obstacle fatal to final accord. Yet it is just such a contract that the district court would have made for parties who themselves had not made it in order to allow plaintiff the relief sought by this action. However desirable it may sometimes seem on ethical grounds, equity has not yet assumed so far-reaching a power. The courts steadfastly refuse to make contracts for litigants. The most they can do is to enforce those already made.

It is a fundamental rule that specific performance will not be decreed unless the contract is certain and complete. The agreement must be free from doubt or ambiguity and "make the precise act which is to be done clearly ascertainable." 25 R. C. L. 218. "To be enforceable, a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations." Shepard v. Carpenter, 54 Minn. 153, 156, 55 N. W. 906. That rule applies to contracts involving patents. Dalzell v. Dueber W. C. Mfg. Co. 149 U. S. 315, 13 S. Ct. 886, 37 L. ed. 749. There is not enough elasticity in it to permit a decree requiring parties to enter into an involved contract, none of the terms or conditions of which have been agreed upon

contractually by themselves. That proposition is too familiar law to require authorities in support. But among those which have been cited to us are the following: Williams v. Stewart, 25 Minn. 516; Holliday v. Hubbard, 45 Minn. 333, 47 N. W. 1134; Ham v. Johnson, 55 Minn. 115, 56 N. W. 584; Gruesner v. Thatcher, 158 Minn. 470, 197 N. W. 968; Mercer v. Payne & Sons Co. 115 Neb. 420, 213 N. W. 813 (where the court declined the job of formulating for parties who had not agreed upon its terms a lease of real estate) ; Mayer v. McCreery, 119 N. Y. 434, 23 N. E. 1045.

Pomeroy states that "for specific performance is demanded that degree of certainty and definiteness which leaves in the mind of the chancellor or court no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is to compel done. 'The element of *completeness* denotes that the contract embraces all the material terms; that of *certainty* denotes that each one of these terms is expressed in a sufficiently exact and definite manner.' " 5 Pomeroy, Eq. Jur. (2 ed.) § 2186. See also Livingston Waterworks v. City of Livingston, 53 Mont. 1, 162 P. 381. Other cases are collected in the annotation of this case in L. R. A. 1917D, 1074, 1079.

An attentive consideration of the cases cited for plaintiff confirms rather than disturbs the views above expressed. In Nichols, Shepard & Co. v. Marsh, 61 Mich. 509, 514, 28 N. W. 699, 701, the agreement enforced, the court said, "was perfectly definite in its terms." So also in Bijur Motor Lighting Co. v. Eclipse Machine Co. (C. C. A.) 243 F. 600, 605, the contract was complete and "clear." There was no obstacle to the court's ascertaining and by its decree enforcing just what the parties themselves had intended and expressed. In Fuller & Johnson Mfg. Co. v. Bartlett, 68 Wis. 73, 31 N. W. 747, 60 Am. R. 838, the license was implied, that is, expressed by the conduct rather than any writing of the parties. But as found by the court, there was nothing fatally uncertain or incomplete about it. In Kearns-Gorsuch Bottle Co. v. Hartford-Fairmont Co. (D. C.) 1 F. (2d) 318, 320, the agreement enforced was "defendant's standard printed lease and license." That is, a

definite and complete form had been set up by the parties them-selves.

It may be, as argued for plaintiff, that by reason of the contract and more particularly the part performance thereof, there has re-sulted a fiduciary relationship between plaintiff and defendant with the duties and obligations peculiar thereto.  Ball & Socket Fastener Co. v. Ball Glove Fastening Co. (C. C. A.) 58 F. 818.  But, assum-ing that, it does not follow that by a decree of specific performance a court should compel the parties to assume the obligations of addi-tional and new contracts to be made for them judicially rather than by themselves in the usual manner of contractual agreement. Neither this decision nor the judgment to be entered pursuant there-to will have any effect (beyond that of denying plaintiff's prayers for affirmative relief) upon the rights of the parties arising from part performance of the contract.  The obligations, if any, result-ing from that performance will not be prejudiced.

Order affirmed.

AFTER REARGUMENT.

On January 16, 1931, the following opinion was filed:

STONE, J.

On plaintiff's petition the case has been reargued on its merits. We adhere to the original opinion except for the modification here-inafter made.  We find no escape from denying plaintiff the main relief it seeks, a decree of specific performance.  There is no occa-sion therefore to pursue that phase of the case farther.

In addition, as well argued for defendant, the case has been tried on the merits and findings made to the effect that the refusal of de-fendant Waters-Genter Company to approve the proposed licensing contract with the Fitzgerald Company was justified.  That finding we cannot disturb.  In view of our conclusion on the other and main branch of the case, it is hardly necessary to review evidence to justify that conclusion.  The fact remains therefore that the agree-

ment, so far as it may be considered a contract, came to an end by its own terms March 1, 1928.

We adhere to our former decision that we cannot, for the reasons there stated, award plaintiff the affirmative relief of a decree of specific performance. However our rehearing and reconsideration of the whole case has convinced us that, in order to dispose of the whole controversy in this action and to avoid so far as we may the possibility of further litigation, we should go somewhat farther in our decision than we did at first.

■ For almost a year the parties occupied the positions and bore the relationships and consequent obligations set up by their agreement. Thereby they created a status the plain duties and obligations of which, so long as it existed, they cannot now escape. To the extent that they performed their compact during the period when by their own acts it was the fundamental and self-imposed law of their relation, the parties must obey it. There is no reason why to that extent their obligations and duties should not be ascertained and, so far as judicial intervention is necessary, enforced in this action. There is no reason for relegating them to another, and the reargument has convinced us that the concluding paragraph of our former opinion was inadequate to that end.

Subdivision VIII of the patent pooling agreement provided that "in the event that no licensing agreement * * * has been entered into by Johnson prior to the first day of March, 1928, then this agreement shall be cancelled and the parties shall, as nearly as possible, restore each other to their status prior to the execution of this agreement." The district court should retain jurisdiction of the action to enforce that stipulation, if the parties, guided by their counsel, cannot themselves make satisfactory application of it.

The agreement further provided in subdivision X, under the head of "Contingent Provisions," as follows:

"In the event that * * * any * * * person engaged in the business of manufacturing and/or selling household electrical appliances, * * * shall directly or indirectly * * * acquire

a majority of the common and/or preferred stock of either the Waters-Genter Company [defendant] or the Dial Company [plaintiff] or shall become financially interested in or enter into any arrangement with the Waters-Genter Company or the Dial Company the result of which arrangement is that any * * * persons shall receive either directly or indirectly the greater proportion of the amount saved through such right as either the Waters-Genter Company or the Dial Company may have to manufacture automatic electric bread toasters under the Rogers and/or Strite patents and any improvements thereon without payment of royalty thereon, or in the further event that (b) either * * * company shall manufacture such toasters under the Rogers and/or Strite patents and shall sell said toasters to or through any of such * * * persons without payment of royalties thereon by said * * * persons under the terms of said patent pooling agreement, or in the further event that (c) any such toasters so manufactured by either the Waters-Genter Company or the Dial Company are sold to others than the ultimate users or bona fide jobbers, wholesalers or retailers, then in any of such events the Waters-Genter Company or the Dial Company, whichever shall be embraced within the terms of any of the aforesaid contingencies, shall pay into said royalty account for each toaster which, except for this paragraph, would be manufactured or sold free of royalty under the Rogers and/or Strite patents or any improvements thereon, a royalty equal to the average royalty per toaster payable under the licensing agreements made under the provisions of paragraph IV hereof."

In an earlier paragraph provision had been made for the setting up of a royalty account into which the anticipated royalties were to go pending division. Plaintiff was to have 43 per cent and defendant 57 per cent of the moneys as distributed from that account. No licensing agreement having been made, it has become impossible to apply the concluding mandate of subdivision X, above quoted, that the payments thereby provided for should be of a royalty "equal to the average royalty per toaster payable under the licens-

ing agreements" which it was anticipated would be made. But that, in our judgment, does not relieve defendant from the obligation to account for its handling and use of both patents during the period the agreement was in force.

Nothing in the foregoing shall be considered as a final construction by us of subdivision X of the agreement, which we have quoted at length. We do not have the benefit of findings sufficient to enable us to apply its somewhat involved provisions to the facts to which it is claimed to be applicable. Neither have we had the aid of argument of counsel directed to the precise issue of the proper construction of subdivision X in its application to the facts, whatever they may be.

The point is that, all other issues aside, one Max McGraw, alleged to be a person "engaged in the business of manufacturing and/or selling household electrical appliances" of the kind aimed at by the subdivision X, took over the control of defendant by stock ownership soon after the agreement of March 19, 1927, was entered into, and by reason of that and the subsequent conduct of defendant's business in relation to the involved patents, subdivision X is claimed to have become applicable on behalf of plaintiff. The issues so raised we do not decide. We consider it the better course to remand the case with directions to the trial court to retain jurisdiction and by the framing of appropriate issues and such evidence, if any, as may be needed or properly offered to decide by appropriate findings of fact and conclusions of law the issue as to what, if any, relief plaintiff is entitled under subdivisions VIII and X of the determinative agreement.

■ The conclusions so reached would not be permissible were the patent pooling agreement open to condemnation as an unlawful attempt to restrain trade under either federal or state law. That point we have considered, and hold that the agreement cannot be so condemned. The only price-fixing agreement it contains is a stipulation that neither party would sell any toaster manufactured under the pooled patents "at a price or on terms less than the lowest price stated in the price maintenance clause of any" licensing

agreement made under it "or on more favorable terms to the customer than those authorized or stated in said licensing agreements." By that stipulation the parties simply bound themselves to protect their licensees against a species of competition by themselves which the licensees would have rather plain reason for regarding as unfair. Inasmuch as the agreement involved patents and the rights of the patentees, we are required by plain policy to follow the holdings of the Supreme Court of the United States. That tribunal refuses to condemn as an unlawful restraint of trade agreements concerning patents having more of the elements of trade restraint and monopoly than the one now before us. Bement v. National Harrow Co. 186 U. S. 70, 22 S. Ct. 747, 46 L. ed. 1058; U. S. v. General Elec. Co. 272 U. S. 476, 47 S. Ct. 192, 71 L. ed. 362.

The case will be remanded for further proceedings not inconsistent with this opinion.

So ordered.